S. JENNIE SORG *et al.* Appellants, *vs.* R. A. CRANDALL *et al.*
Appellees.—A. H. LOWDEN *et al.* Appellants, *vs.* S. JEN-
NIE SORG *et al.* Appellees.—ROBERT P. SHIELDS *et al.*
Appellants, *vs.* S. JENNIE SORG *et al.* Appellees.

*Opinion filed February 20, 1908—Rehearing denied April 8, 1908.*

1. MECHANICS' LIENS—*word "owner," as used in Mechanic's
Lien act, means an owner of any interest in the land.* The word
"owner," as used in the Mechanic's Lien act, means an owner of
any interest in the land, and a person who contracts with such
owner may, by pursuing the course pointed out in the statute, ac-
quire a lien upon the interest of that owner and of all other own-
ers acting with him.

2. SAME—*when claim for lien is applicable to the fee.* A claim
for a mechanic's lien filed with the clerk, in which the property
sought to be charged is described as a certain tract of ground, with-
out any limitation, is applicable to the whole title; and it is not
necessary, in order to charge the interest of the owner of the fee,
that he be named in the claim for lien, provided he was acting with
the party who made the contract and who is named in the claim.

3. SAME—*statute does not require a claim for lien to name the
owner.* The Mechanic's Lien act, as amended in 1887, does not re-
quire that the name of the *owner* of the property charged with the
lien shall be stated in the claim for lien filed with the clerk, but
only that the claim shall state the name of the person against whom
the lien is filed and a description of the property charged with the
lien. (*Provost* v. *Shirk*, 223 Ill. 468, explained.)

4. SAME—*when time of performing labor is sufficiently verified.*
The statement in a claim for a mechanic's lien, where the contract
is entire, may properly include all labor and material as a single
item; and the fact that the account filed states in separate items
the materials and labor, with the respective dates when the same
were furnished, does not require that the time for performing the
labor shall be further verified than that it was furnished between
certain dates when the work was begun and completed.

5. SAME—*when claim for lien is filed in time.* A claim for a
mechanic's lien is filed in time which is filed within four months
from the time of maturity of the last of the notes which, under the
terms of the contract, were to be given for the balance due.

6. SAME—*use of numerals to indicate months and days proper.*
A claim for a mechanic's lien is not rendered uncertain or invalid
because of the use of numerals to indicate the months and days

when labor and materials were furnished, nor because ditto marks are omitted as to items having no date in the margin but which immediately follow a dated item.

7. Same—*when claim for lien is properly filed as a joint claim.* Where two persons chosen as arbitrators of a building dispute are subsequently authorized by the parties to jointly furnish the material and labor to completely perform the contract, and they proceed to carry on the work jointly, rendering bills in that manner and being recognized as joint contractors, a claim for lien for the work done by them is properly filed as a joint claim, notwithstanding they never formed a partnership, and that, as between themselves, one was to receive pay for the carpenter work and the other for the masonry.

8. Same—*what is a sufficient specification of time when work was performed.* Section 4 of the Mechanic's Lien act, as amended in 1887, requiring the statement or account to set forth the times when the labor was performed, is sufficiently complied with if the work on a certain job, such as papering, excavating, bricklaying, etc., is charged at the end of each week or at the regular pay-day when the men who performed the work were paid.

9. Same—*when fee is not subject to a mechanic's lien.* Where the contract between the owner of the fee and the lessee provides for the erection of one building only, which is completed and turned over to the lessee, the interest of the lessor cannot be subjected to a mechanic's lien for the subsequent construction of an addition to the building, in the absence of any showing that he authorized or consented to the additional work.

10. Same—*submission to arbitration does not waive right to a mechanic's lien.* The remedy given by statute for the enforcement of a mechanic's lien is merely cumulative, and the fact that the contractor and the owner submit their differences to arbitration does not waive the contractor's right to a lien, if any lien exists, but only affects the question of the amount, if anything, which is due the contractor.

11. Same—*when the architect's certificate must be regarded as withdrawn.* Where, after the construction of a building is begun, the partnership of the supervising architects is dissolved and a third person is, with the knowledge and consent of the parties, appointed as their agent to control the work, such person has all the powers possessed by the architects under the contract, and if he stops payment of the final certificates, as the architects had power to do, such certificates must be regarded as being withdrawn.

12. Same—*when contractor is estopped to insist that architect's certificate is binding.* Where, after the architect's final certificate

is issued, the contractor and the owner of the building submit their differences to arbitration, and the contractor authorizes the arbitrators to make large expenditure to make the building comply with the contract, the contractor is estopped to claim that the architect's certificate is conclusive; and such estoppel exists not only in favor of the owner of the building, but also as to the owner of the fee, whose interest is subject to a lien only by virtue of his agreement with the owner of the building.

13. PLEADING—*when jurisdiction is not lost by irregularity in pleading.* The fact that the widow and heirs of the owner of the fee of property involved in a mechanic's lien proceeding were not brought in by a bill of revivor after his death does not defeat the jurisdiction of the court to render a decree against them, where the pleadings were amended to make them parties and they appeared and answered and had the benefit of all defenses, although they denied in their answers that they took as heirs and alleged they took as grantees.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

On June 20, 1894, Paul J. Sorg filed his bill in the circuit court of Cook county against various defendants, in which he sought to have set aside and declared null and void, as clouds upon his title, certain conveyances and claims for mechanics' liens. Cross-bills were filed by some of the defendants, in which they sought to establish liens. Upon a hearing a decree was entered in accordance with the prayer of the original bill. Upon appeal the Appellate Court reversed the decree and the cause was remanded to the circuit court with directions to dismiss the original bill, also the petitions for mechanics' liens, without prejudice to proceedings other than for mechanics' liens, under the statute. (*Crandall* v. *Sorg,* 99 Ill. App. 22.) A further appeal was prosecuted to this court, where on June 19, 1902, the judgment of the Appellate Court and the decree of the circuit court were each reversed and the cause was remanded to the circuit court, with directions to overrule the recommenda-

tions of the master that a decree be entered in favor of Sorg on the ground that no mechanics' liens could in any event attach to his title, and to proceed to consider and dispose of the question of the validity of the alleged mechanics' liens of the defendants in the original bill, being the complainants in the cross-bills, filed to establish liens. (*Crandall* v. *Sorg,* 198 Ill. 48.) In these cases the facts under consideration are fully set out and it is not necessary to re-state them.

After the decision by this court, and in May, 1903, Paul J. Sorg died, leaving surviving him his widow, S. Jennie Sorg, and Paul J. Sorg and Ada G. Sorg, his children and only heirs-at-law. Upon the cause being re-docketed in the circuit court the original bill was not revived by the Sorgs but amendments were filed to the cross-bills, alleging the fact of the death and survivorship, and making the Sorgs, widow and heirs, parties in place of the deceased. Summons was issued against them, but they appeared before it was served, and after interposing demurrers to the cross-bills, which were overruled, filed answers thereto. They claimed title in themselves by a deed from Paul J. Sorg of date April 12, 1900, and set up various other matters not necessary to be here set forth, which in their opinion precluded any lien from attaching to the fee title. On exceptions filed, all such matters of defense were held to be impertinent and were expunged from the answer.

Upon the second hearing in the circuit court a decree was rendered dismissing the original bill filed by Paul J. Sorg and the cross-bills of A. H. Lowden and George W. Ilett, Robert P. Shields and John T. Cook, and declaring liens in favor of Robert A. Crandall, George M. Gross, Simpson Bros., Robert Gordon and Albert H. Hettich. Separate appeals were prosecuted to the Appellate Court by all the parties against whom the decree was rendered, and the decree was affirmed as to all except Hettich, and as to him it was reversed and the cause remanded, with directions to dismiss his cross-bill for want of equity. All parties

against whom the decree was affirmed have prosecuted further appeals to this court and the appeals have been heard as one. In No. 5298 the widow and heirs of Paul J. Sorg are appellants, and Crandall, Gross, Gordon and Simpson Bros., whose liens were allowed, are appellees; while in No. 5299, in which Lowden and Ilett's personal representatives are appellants, and in No. 5300, in which Shields & Cook are appellants, the Sorgs are appellees.

H. H. C. MILLER, and W. S. OPPENHEIM, for appellants S. Jennie Sorg *et al.*

ATWOOD, PEASE & LOUCKS, for appellants Robert P. Shields, John T. Cook, and A. H. Lowden *et al.*

HOLLAND & ELLIOTT, for appellees Simpson Bros.

EASTMAN, EASTMAN & WHITE, JOHN T. RICHARDS, and ALDEN, LATHAM & YOUNG, for appellees R. A. Crandall, George M. Gross and Robert Gordon.

Per CURIAM: It is claimed by counsel for S. Jennie Sorg, Paul A. Sorg and Ada G. Sorg that no lien attached to the interest of Paul J. Sorg, the owner of the fee, because the claims for liens filed with the circuit clerk did not mention him as owning any interest in the premises. Section 4 of the act of 1874, as amended in 1887, (Laws of 1887, p. 219,) which governs the rights of the parties in this case, provides that "every creditor or contractor who wishes to avail himself of the provisions of this act shall file with the clerk of the circuit court of the county in which the building, erection or other improvement to be charged with the lien is situated, a just and true statement or account or demand due him, after allowing all credits, setting forth the time when such material was furnished or labor performed and containing a correct description of the property to be charged with the lien, and verified by an affidavit." There

is no requirement here that the statement shall set forth the name of the owner of the property or anything in regard to the title. By section 53 the clerk is required to make an abstract of the claim in a book kept for the purpose, showing the name of the person filing the lien, its amount, the date of filing, the name of the person against whom filed and a description of the property charged with the lien. There is no requirement that the name of the owner of the property charged with the lien shall be stated, unless it is in the words, "the name of the person against whom the lien is filed." Where the property sought to be charged with the lien is described merely as a certain tract of ground, without any limitation, the claim is applicable to the whole title,—the fee. "The owner," as used in the act, means the owner of any interest in the land. (*Paulsen* v. *Manske,* 126 Ill. 72.) On the former appeal it was held that the Mecca Company and Sorg were acting together in the construction of the building,—that each was interested therein; and within the meaning of the mechanic's lien statutes they were, as to those who should furnish labor or material in the construction of the building, owners of the property. And it has been held that, even before the act of 1895, a vendor or lessor who stipulated for the erection of a building upon the premises sold or demised, thereby subjected his interest in the premises to the lien of those who furnished the labor and material for the building. (*Paulsen* v. *Manske, supra; Henderson* v. *Connelly,* 123 Ill. 98; *Williams* v. *Vanderbilt,* 145 id. 238; *Carey-Lombard Lumber Co.* v. *Jones,* 187 id. 203.) And where one has contracted with an owner of land,—that is, with any one having an interest therein,—to furnish labor or materials for an improvement thereon, if his claim for lien filed in the clerk's office states the name of the owner contracted with and a description of the property sought to be charged, it will be sufficient to reach the interests of all owners who were acting together in the making of the improvement and

have thereby made their interests subject to the mechanic's lien. The statute does not require the contractor to investigate the title. If he contracts with an owner, by pursuing the course pointed out by the statute he acquires a lien upon the interest of that owner and all other owners who were acting together with him, whether the contractor was informed of their interest or not.

In the case of *Provost* v. *Shirk,* 223 Ill. 468, which has been cited as conclusive of the proposition that failure to name the owner of the fee in the claim for lien is fatal to any claim against his interest, there was no attempt, in the claim filed, to hold the fee. The property was described in express terms as a leasehold interest. The petitioner having limited his claim for lien to the leasehold interest could not claim a lien on property which he had not described,— that is, the fee. The contract in *Campbell* v. *Jacobson,* 145 Ill. 389, also cited to the same point, was not with an owner of the land and created no lien whatever.

The death of Paul J. Sorg was suggested to the court, and each of the cross-bills was amended so as to make his widow and heirs parties, and they entered their appearance and answered the respective cross-bills. They insist now that the court had no jurisdiction to render a decree against them, because they were not brought into court either by a bill of revivor or a bill in the nature of a bill of revivor. The proceeding by which they were brought into court may have been irregular but they made no objection to it. By whatever names the pleadings may be called, they suggested the death of Paul J. Sorg, made his heirs and widow defendants, and alleged that they had succeeded to his interest by reason of his death. Two of the cross-bills also set up the deeds made to them in Paul J. Sorg's lifetime. In their answers the widow and heirs deny that they took the title as heirs and allege they took as grantees. But this was immaterial. Both the cross-complainants and these defendants alleged that the latter succeeded to the title of Paul J. Sorg,

and the only difference between them was as to the manner of succession, and that was of no consequence. The defendants thus brought in had the benefit of the pleadings already filed, were permitted to present any defense they had, and no prejudice to them has been shown by the irregularities of procedure, if any, which have intervened.

The claim for lien filed by the appellee Crandall is in the form of an account against the Mecca Company, beginning, after the heading, as follows:

"1892.

| June 13, | Labor, Washburn 22 hrs. | |
| | Hilton 6, Todd 22, | |
| | Beckett 22, Rumsey 22, | |
| | Bingham 22, Lynch 22, | $69.00 |
| 17, | 160 No. Whiting 02, 320 No. 8 | |
| | Glue, .20 1.60 | 4.80 |
| | No. 5 Umber 10, 50, 5 No. ochre | |
| | 5.25, 6 No. sienna .10-.60 | 1.35." |

It continues with many items to the final entry, February 16, $20, and the footing, $7330.95. Beneath the footing, under date of April 15, appears the item, "Cash credits $4018.37," and the subtraction is made, leaving $3222.58. It closes with the following statement and affidavit:

"All said materials above set forth was furnished and delivered at times and dates above mentioned and became due and payable on, to-wit, April 1, 1893, and was all used upon and in construction and improvement of apartment of hotel building known as 'The Mecca,' situated on north side of Thirty-fourth street, extending from State to Dearborn streets, in Chicago, Cook county, Illinois, and situated upon, (description of premises,) and that there is now due and owing to said Roland A. Crandall from said The Mecca Company, after allowing to it all just deductions, credits and set-offs, sum of $3222.58, for which amount Roland A. Crandall claims a mechanic's lien on above described property.

"State of Illinois, }
    County of Cook. }  *ss.*

"Rolland A. Crandall, being first duly sworn, deposes and says that he is the claimant for above lien; that he has read the foregoing statement; that he knows the contents thereof, and that the same is true in substance and in fact.

"Subscribed and sworn to."

It is objected that this statement and affidavit do not comply with the requirements of section 4, in that there is no verification of the time when the labor was performed. Crandall's contract was an entire one for the interior decoration of certain rooms for $4970. During its performance other labor and materials were furnished at the request of the Mecca Company as extras, so that when the work was completed Crandall had furnished, including both his original contract and extras, materials and labor to the amount of $7330.95, and there was due him, after deducting credits, $3222.58. It was not necessary for the statement to itemize, with so great particularity as it did, the labor and materials furnished. The contract was an entire one, and the statement might properly have included all the work and material as constituting a single item. (*Hayes* v. *Hammond*, 162 Ill. 133.) It is not, however, made defective by reason of its itemizing separately the various kinds and amounts of material and labor furnished in the performance of the contract. The account gives the various quantities and kinds of material furnished from day to day, with the dates and values, beginning with the commencement of the work and continuing to its conclusion. The labor is included in various items, probably under the dates when the men doing the work were paid, rather than when the work was done. The affidavit verifies the truth of the statement, and the statement shows the work to have been done between June 13, 1892, and February 16, 1893. Whether the work was all done at the precise time stated in the account is immaterial, since the entire contract constituted a single item and need not have been further itemized.

It is also insisted that it does not appear that Crandall's claim was filed within four months after the last payment under his contract was due. All the work he did, including the extras, was done under the contract, and the last item thereof was February 16, 1893. Under the contract, upon its completion notes were to be given for the balance due,

the last maturing in one hundred and twenty days. The claim for lien was filed July 29, 1893, which was less than four months after one hundred and twenty days from February 16, 1893.

Crandall sued the Mecca Company on March 13, 1893, and recovered a judgment on July 8, 1893, for the amount due him. It is urged that he is therefore estopped from claiming that his whole account against the Mecca Company was not due at the date of bringing his suit. No doubt that suit could have been defeated by a plea in abatement. None such was interposed. Under the doctrine of *Dawson* v. *Black*, 148 Ill. 484, no estoppel arose.

The claim for lien of the appellee Gross is objected to because it is said not to set forth the time when the materials were furnished and labor performed, but, in fact, it does so, as the evidence shows, with substantial accuracy. There is a discrepancy of five days between his claim for lien and his testimony, taken nearly two years afterward, as to the time of the completion of the work, but we do not regard this, under the circumstances, as a substantial variance.

The claim filed by Simpson Bros. was for laying a cement floor in the basement under direction of Lowden and Ilett. It itemized the account so far as necessary, and the affidavit verified the time of furnishing the material and labor. We think the claim filed complies with the requirements of the statute. No objection to the decree in favor of these parties is made which is entitled to serious consideration.

The objection made to Gordon's claim is, that the dates are indicated by figures in the date column at the left of the page, thus: 2/4, 2/6, under the heading, "Chicago, February 15, 1893." The meaning of these figures thus used is well understood and they sufficiently indicate the dates. So of the omission of ditto marks where several items having no date in the margin immediately follow an item having such date. These statements of account are prepared in ac-

cordance with the usual custom of many book-keepers, and no one having occasion to investigate the statement filed could be in any doubt as to its meaning.

Disagreements arose between the Mecca Company and the building contractors as to whether the latter had performed the conditions of the contract, and these differences were by agreement submitted to Alexander H. Lowden and William Ilett as arbitrators. Later the contractors authorized the arbitrators to supply all material and labor necessary, in the judgment of the arbitrators, to a complete performance of the building contract, including all extra work. The arbitrators proceeded under this authority to do what was necessary, in their judgment, to complete the contract, and were paid therefor by the Mecca Company, except $280.93. For the labor and material furnished by them under this contract they jointly claimed a lien and their claim was rejected. It is insisted that they were separately, and not jointly, interested in the work done, and that therefore the claim filed by them jointly was not in compliance with the statute, but that if entitled to liens each should have filed a separate claim.

Lowden and Ilett were not partners and prior to their selection as arbitrators were unacquainted. Lowden was a carpenter and Ilett a mason, and they were selected in the first place merely to decide what material, if any, should be taken out and replaced, what work, if any, should be done over by the contractors, or what money allowance, if any, should be made to the Mecca Company in lieu thereof, and what sum, if any, should be paid by either party to the other. Upon examination the arbitrators discovered that work to a considerable amount would have to be done, and the contractors requested the arbitrators to do the work. The latter declined to do anything without a written order therefor, and thereupon the contractors gave to Lowden and Ilett a letter, addressed to them jointly, authorizing and requesting them to supply such material and labor as they might find

necessary to complete the work under the building contract, including all extra work undertaken in connection with said contract. Upon the strength of this authority Lowden and Ilett expended $43,294 in the completion of the work of the original contractors, which was all repaid to them by the Mecca Company except the balance above mentioned. As this work was done pursuant to an order in writing addressed to Lowden and Ilett jointly, and as neither the Mecca Company nor Shields & Cook were in anywise concerned with the question of the division of the money due Lowden and Ilett, we think the claim for lien was properly filed by them jointly.

It is further objected that the claim filed does not set out with sufficient certainty the time when certain of the material was furnished and certain of the work was done. The first item is dated March 27, 1893, and is for one hundred and eighty-six hours' time papering, at forty-five cents, $83.70. The evidence shows that this work was done by George Pollard, an employee of Lowden and Ilett, during the part of the month of March which preceded the 27th and paid for on the last mentioned date. Various items charged under one date cover like conditions, the work of several days being charged, apparently, on the date upon which payment was made to the laborer. "The purpose of requiring the claim to set forth 'the times when such material was furnished or labor performed' is obviously to enable those interested to know from the claim itself that it is such as can be enforced." (*McDonald* v. *Rosengarten*, 134 Ill. 126.) The statement must be itemized to a reasonable extent and in a reasonable manner. It is not necessary to set forth therein each day's work by each particular laborer or mechanic. If a dozen men are at work and are paid at the end of the week for that week's work, we think it a compliance with the statute to charge for their labor on the date on which payment was made,—at least where the right to a lien is not altered by the mere lapse of time

between the day when the work was performed and the day upon which it was charged. This objection we consider without merit.

During the progress of the work performed by Lowden and Ilett, under the writing given them by Shields & Cook, Mr. Harmon, acting for the Mecca Company, of which he was then president, employed Lowden and Ilett to furnish material for and to do certain work not covered by the contract between the Mecca Company and Shields & Cook. This material was furnished and work done and a lien is claimed therefor. Substantially the whole of this claim is for the building of an addition to the original building, consisting of a dining room and an oven. The work, when completed, was to be paid for by the Mecca Company. It is conceded that Shields & Cook were not liable for this additional work, and it is not evident that Sorg knew anything about it or is chargeable with knowledge that it was being done. "Where a lease does not require or authorize the lessee to construct improvements on the demised premises, the estate of the lessor is not liable to liens of laborers or material-men unless the lessor has otherwise expressly consented and agreed that such improvements should be made upon his premises." *Crandall* v. *Sorg,* 198 Ill. 48; *Williams* v. *Vanderbilt, supra.*

The contract between Sorg and Hullinger is set out *in hæc verba* in *Crandall* v. *Sorg, supra.* Hullinger assigned his rights thereunder to the Mecca Company. It is by virtue of that contract that the fee owned by Sorg becomes subjected to liens in this case. That contract authorized the construction of a building to cost not less than $300,000, and it is insisted that the building of this addition and the other additional work performed by Lowden and Ilett comes within the terms of the contract between Sorg and Hullinger, for the reason that the contract made between the Mecca Company and Shields & Cook did not exhaust the Mecca Company's power to bind Sorg. It is to be observed, how-

ever, that Hullinger's contract contemplated the construction of one building, which was to be ready for occupancy on or before February 1, 1893. The building constructed by Shields & Cook was ready for occupancy and was by them turned over to the Mecca Company, to be by it occupied, on August 23, 1892. All the additional work done for which a lien is claimed was done after February 1, 1893. It is therefore apparent, as we think, that the building of this addition and the so-called additional work done by Lowden and Ilett cannot be said to have been authorized or consented to by Sorg. Lowden and Ilett were entitled to a lien upon the fee for the unpaid balance due them on account of the work which they were authorized to do by Shields & Cook. They were entitled to no lien upon the fee for the additional work done or additional material furnished by them.

After the evidence was taken before the master, Ilett departed this life, and his personal representatives were properly made parties to the proceeding by virtue of the provisions of section 26 of the Lien act of 1874.

Robert P. Shields and John T. Cook, composing the firm of Shields & Cook, entered into a contract with the Mecca Company for the construction of the building, which was to be a four-story brick apartment house, with store rooms on the ground floor and ninety "flats" above. The contract price was $420,000, of which $10,000 was to be accepted in stock of the Mecca Company at its par value, if the corporation so requested. Shields & Cook filed a claim for lien for $420,000 and for an additional sum of $46,-178.40 for extra work and materials, making an aggregate of $466,178.40. In the statement they give credit for $321,823.02, leaving a balance due, according to their contention, of $144,355.38. To their assertion of a right to a lien several objections are made. The master found that the fee of the property could not be subjected by them to a lien, but further found that in case it could be so subjected

a lien should be decreed in their favor, against the fee, for $74,142.70. The circuit court held that under the pleadings Shields & Cook could have no affirmative relief and denied their lien for that reason. The Appellate Court held that the claim for lien filed with the circuit clerk was not in compliance with the statute and denied a lien for that reason.

Under the contract between Sorg and Hullinger the ground upon which the building was constructed was sold by the latter to the former for the sum of $200,000. Of this sum $100,000 was to be paid in cash, and the other $100,000 was to be deposited in a bank in the city of Chicago and was to be paid to Hullinger in the manner following: $25,000 was to be paid after Hullinger had expended $50,000 in the construction of a building on the ground, the expenditure of that sum to be shown by the architects' certificate and receipted bills; when the fourth-floor joists were laid, an additional sum of $25,000 was to be paid to Hullinger upon the same conditions relating to the presentation of the architects' certificate and receipted bills as was provided for in relation to the payment of the first $25,000; and the remainder, $50,000, was to be paid when the building was ready for occupancy and all sums due on account of the construction thereof had been paid. Shields & Cook had knowledge of the terms of this contract. On October 23, 1891, they received from the architect a certificate showing that $50,000 was due them. No money was then paid to them, and without receiving any money they gave a receipt to the Mecca Company for the sum of $50,000, for the purpose of enabling that company to collect the first $25,000. That amount of money, in accordance with the terms of the Hullinger contract, was then paid by Sorg to the Mecca Company. Later, after the fourth-floor joists were laid, Shields & Cook again gave to the Mecca Company a receipt for money which in fact had not been paid to them, for the purpose of assisting that company to col-

lect the second $25,000, and it was thereby enabled so to do. In January, 1892, Zimri Dwiggins, of the Columbia National Bank, undertook to negotiate the bonds of the Mecca Company to the amount of $200,000, to be secured by a mortgage upon the leasehold. In order to do this he desired from Shields & Cook a written statement showing the amount they had received upon the contract and the balance which would become due them. Accordingly they made a statement, showing that they had then received $274,665.96, and that an additional sum of $145,334.04 would fully compensate them for the completion of the building and pay all moneys due or to become due to them on the building contract. At that time they had, in fact, actually received in cash and real estate but $149,665.96. Upon the strength of this statement Dwiggins sold the bonds to various parties. The statement was false, as appears above, in that they had at that time received a much smaller sum than the amount which they therein stated they had received, and after signing that document they were paid in cash, from time to time, down to August 23, 1892, $161,334.04, being $16,000 more than the amount necessary to fully satisfy their claims under the building contract according to the statement in question. Prior to the time when Shields & Cook entered into the contract with the Mecca Company they had certain negotiations with one George T. Montgomery, who was secretary of the Mecca Company. That corporation was capitalized at $300,000. Montgomery had subscribed for $151,000 of this stock but was without ready money to pay for it. He induced Shields & Cook to bid for the contract and assisted them in obtaining it. Thereafter they entered into a contract with him by which they were to accept and apply on the contract price lands to the amount of $150,000, which Montgomery was to convey to them from time to time. When he made a conveyance of land to them they were to give him a re-recipt, as they afterward did do, showing a payment of the

amount of the consideration on the building contract, and Montgomery intended to and did deliver these receipts to the Mecca Company in payment of his stock subscription. The lands were not readily salable, and Shields & Cook agreed to take them at figures very much above their real value. This arrangement was for the purpose of enabling Montgomery to convert these lands, at the price fixed by him, into stock of the Mecca Company,—a thing which he seems not to have been able otherwise to do.

It is contended by the Sorgs that the actions of Shields & Cook in making the false receipts and the false statement, and in making the contract with Montgomery, constituted such fraud as bars their right to enforce a mechanic's lien in a court of equity, and that they are now estopped to contend that they had not received cash as shown by the receipts that were made to deceive Sorg, and by the statement that was made for the purpose of enabling Dwiggins to sell the bonds.

In accordance with the expressed desire of Shields & Cook we have examined their claim upon its merits, and have found it unnecessary to decide any of the questions raised by the objections above suggested to their claim, for the reason that we have concluded, from the evidence, that there is nothing due them under the terms of the building contract which they entered into with the Mecca Company. By that contract it was provided that the building should be constructed to the full and complete satisfaction of Edbrooke & Burnham, architects, or their assistant superintendent, according to plans, drawings, specifications and conditions accompanying the contract, and that payments were to be made upon the architects' certificate, from time to time, as the work progressed. Any balance remaining unpaid was to be paid upon the completion of the building, provided the superintendent should certify, in writing, that the contractors were entitled to the payment of the balance of the contract price. Provision was made for furnish-

ing and paying for extra work and material and for such changes in the plans as might be deemed necessary by the architects, who were to be the sole interpreters of the plans, drawings and specifications. The architects were given power to stop the payment upon any certificate after the same was drawn, if in their judgment the case demanded such stoppage for the proper protection of the owner. On August 23, 1892, Mr. Shields delivered the keys of the building to Montgomery, who was still the secretary of the company, on the theory that the building was completed, and Mr. Shields received from the company its receipt for the keys, containing an agreement releasing Shields & Cook from any responsibility for damages that might thereafter occur to the building.

Edbrooke & Burnham appointed John Caruthers assistant superintendent of the building to see that the plans and specifications were fully carried out. After the foundation was laid Caruthers was away from the building for about a month and during that time Mr. Burnham gave the work some supervision. Before the building was completed the firm of Edbrooke & Burnham was dissolved, and they then made George Strong their agent, who thereafter acted in their stead. When a certificate was to issue, Caruthers would advise Strong of the amount for which it was to issue and Strong would sign and deliver the certificate. On September 10, 1892, he issued a certificate for $69,000, which was the final certificate for the contract price of $420,000. Thereafter Caruthers figured up the amount due for extra labor and material, and on October 11, 1892, two certificates were issued to cover the balance which he found due for extras,—one for $2289.29 and the other for $17,-355.41. Certificates for extras had also been issued at dates prior to August 23, 1892. Thereafter the Mecca Company, being dissatisfied with the manner in which the building had been completed, asserted that the contract had not been complied with, and Strong, on November 14, 1892, by a

letter addressed to the president of the Mecca Company, which was introduced in evidence, directed that company to "stop all further payments on account of certificates made to Shields & Cook" in connection with the contract with the Mecca Company. Mr. Shields testified that he received a letter from Strong on the same subject, which he threw in the waste basket, and that he thereafter had a conversation with Strong in reference to the same matter, and that Strong's letter to him and his conversation with him were to the effect that the only certificates upon which payment was stopped were the two issued on October 11, 1892, for extras. Prior to this time, however, and on November 4, 1892, for the purpose of adjusting the differences between them, Shields & Cook and the Mecca Company entered into an arbitration agreement, which in words and figures is as follows:

"Whereas, Shields & Cook, August 31, 1891, entered into contract with Mecca Company for erection of building according to plans and specifications by Edbrooke & Burnham, architects; and whereas differences have arisen as to whether Shields & Cook have performed conditions of agreement and as to allowances to be made Mecca Company for certain changes from original plans and specifications by which work was cheapened, and as to claims made by Shields & Cook for extra work and materials, and as to claims made by either of said parties for damages for non-performance of contract on part of others; and whereas said parties are mutually desirous of adjusting all matters of dispute:

"Now, therefore, Shields & Cook and Mecca Company, in consideration of premises and one dollar by each to other paid, do hereby mutually covenant to submit all said matters of difference, and all causes of action and demands based thereon, to Alexander H. Lowden and William Ilett, of Chicago, Illinois, who shall arbitrate same, and decide what, if any, material shall be taken out and replaced, and what, if any, work shall be re-done by said contractors, or, in lieu thereof, what, if any, money allowance shall be made said Mecca Company therefor, and what, if any, sum shall be by either of us paid to the other, with full power to award payment of costs incurred in arbitration. In case said arbitrators are unable to agree, such matters shall be submitted to George Tapper, of Chicago, as third arbitrator. And we do mutually covenant and agree that award of said arbitrators, or any two of them, shall be by us kept and performed."

233 — 7

And on November 14, 1892, the same date upon which Strong's letter was written to the president of the Mecca Company, it having become evident that the work did not comply with the plans and specifications, Shields & Cook gave to Lowden and Ilett, two of the arbitrators, the following instrument in writing:

"CHICAGO, ILL., *Nov. 14, 1892.*

"*Messrs. Alexander H. Lowden and William Ilett, Arbitrators, etc.*

"GENTLEMEN—You are hereby authorized and requested, so far as you may deem ·advisable under terms of arbitration agreement under which you are appointed, to supply such material and labor as you may find necessary to complete all items of work, or to replace or remedy all defective, improper or damaged material or work furnished or performed or necessary to be furnished or performed under our contract dated August 31, 1891, for construction and finishing of building at north-west corner of Thirty-fourth and State streets, known as Mecca Building, including as well all extra work undertaken by us in connection with said contract or building.

˒ SHIELDS & COOK."

The Mecca Company agreed to meet such expenditures as should be made pursuant to the authority so conferred upon the arbitrators.

Lowden and Ilett, in the performance of their duties as arbitrators, spent two hundred and fourteen days in examining the building and in supervising the work that they directed should be done under the terms of the written instrument last above set out. The work which was done and materials which were furnished under their direction, in accordance with that writing, was of the value of $43,294. As arbitrators they made a finding that nothing was due from the Mecca Company to Shields & Cook, but, on the other hand, that there was due from Shields & Cook to that company the sum of $55,000. That award was attacked by Shields & Cook in the superior court of Cook county and was there set aside. The reasons that led to that action do not appear other than by statements of counsel. Upon a hearing before the master evidence was introduced for the purpose of showing that the building was so defective, both in material and construction, that nothing fur-

ther was due to Shields & Cook on account thereof. The master found that while the evidence showing defects was rather strong, inasmuch as the building was erected under the supervision of the architects or their superintendent, Caruthers, the decision of the architects and superintendent must be final and binding and the certificates they issued conclusive, in the absence of any showing of fraud or mistake connected with the issuance of those certificates. The master found, however, that, as against Sorg, Shields & Cook were estopped to say that they did not receive the $50,000 acknowledged by the first false receipt, and made certain other deductions which reduced the balance claimed by Shields & Cook to $74,142.70, as above stated.

We do not think it is true, as contended by Sorg, that submission of the dispute to arbitrators waived the mechanic's lien. Under our statute the remedy by enforcement of the lien is merely cumulative. If the arbitration had been legally conducted and the award had established that some amount was due Shields & Cook, they could not thereafter, as a matter of course, enforce a lien for any larger amount. But had a lien existed it would not have been affected by such an award except in reference to the amount that could have been collected by its enforcement.

We think, however, that the master was in error in his finding with reference to the conclusive character of the architects' certificates, under the circumstances of this case. It is contended that Strong had no authority to withdraw, or stop payment upon, the certificates in any event. It is said that Caruthers was authorized by the contract to issue the certificates, that they were issued upon his order, and that having been so issued payment thereon could be stopped only by the exercise of his authority. It appears from the testimony of Mr. Burnham, which is not disputed, that when the firm of Edbrooke & Burnham was dissolved Mr. Strong was appointed their agent and had absolute control of their work from that time on. It appears that

the Mecca Company, Ray (who was Sorg's agent) and Shields & Cook all had knowledge of this arrangement and acquiesced therein. After that time Strong stood in the same relation to all the parties interested in this contract, and to Caruthers, that Edbrooke & Burnham had before that time occupied. By the contract between the Mecca Company and Shields & Cook, the architects, Edbrooke & Burnham, were made the superintendents of the building. Caruthers was assistant superintendent, although he sometimes is designated in the oral evidence as superintendent and was erroneously so regarded by the master. The contract empowered the "architects" to stop payment of any certificate after the same was drawn. The word "architects" as there used included Strong after he had charge of the business of Edbrooke & Burnham. He, therefore, according to the agreement of the parties, had the right to stop payment upon the certificates. When he did so, they were suspended or withdrawn and consequently ineffectual. Further than that, if the parties regarded the certificates as having the final and binding character, under the contract, that appellants now contend they did have, there was never any occasion for any arbitration. The matter had already been settled. Shields & Cook entered into an arbitration agreement, and afterward authorized the arbitrators, so far as they could do so, to remedy the defects, both of material and construction, found in the building, and under that authority the arbitrators expended $43,294, which has all been paid to them by the Mecca Company except $280.93. If the certificates were final and binding, this amount so paid to the arbitrators could not properly be charged against Shields & Cook, and the latter, by entering into an arbitration agreement and authorizing the arbitrators to make the expenditures, have led the Mecca Company to pay $43,000 which it could not otherwise have been required to pay. We think by their course in submitting their claims to arbitration and in authorizing the arbitrators, as their agents,

to make the expenditures which they did make, they, Shields & Cook, are now estopped to say that the certificates are final and binding. It is true that, so far as estoppel is concerned, Sorg did not act upon the arbitration agreement and did not change his position by reason thereof. But it must be remembered that the fee in this property could only be subjected to this lien by virtue of the Hullinger contract, under the provisions of which the Mecca Company was authorized to enter into a contract for the erection of a building, the builders of which might have a lien both upon the fee and the leasehold. The Mecca Company was personally liable upon the contract to Shields & Cook. The property of that company, viz., the leasehold, and the property of Sorg, viz., the fee, were both liable to be subjected to a lien for the satisfaction of the amount due the builders, and we held, in effect, in *Crandall* v. *Sorg, supra,* that the construction of the building was the joint enterprise of Sorg and the Mecca Company. We think that when Shields & Cook were estopped to say as to the Mecca Company, which was the only corporation or person individually liable to them upon the contract, that the certificates issued by the architects were final, they were likewise estopped so far as the fee in the property was concerned. We therefore conclude that the certificates are not final as to the amount due to Shields & Cook, because under the contract they were properly withdrawn or suspended by Strong and because Shields & Cook are now estopped to aver that they are conclusive in character.

As to the condition of the building when it was turned over to the Mecca Company as complete, a number of witnesses testified. We have been particularly impressed by the testimony of the arbitrators, Ilett and Lowden. They devoted many days to an examination of the building and did their work in a very painstaking and thorough manner. Their evidence clearly indicates that each had better knowledge of this building, its material and its construction,

than that possessed by any witness who testified, other than themselves. They were builders of long experience. They were very intelligent, and seem to have been disinterested, frank and of good judgment. They were apparently animated by no purpose except a desire to tell the truth. Mr. Lowden was selected by Shields & Cook, Mr. Ilett by the Mecca Company. It appears from their testimony that they found the building settling in many places; many doors that would neither shut nor lock. The dimension stone specified for the foundation was missing. The joists were placed too far apart. The piers supporting the center of the building were without dimension stone. A poor quality of rubble stone had been used instead. The studding should have been placed twelve inches from center to center. It was, in fact, placed sixteen and sometimes twenty inches from center to center, without any bridging. The specifications required joists to be laid double around all openings and under all partitions. It was not so done. In many instances there were no joists at all under the partitions, but they would be found at some distance to one side or the other. The studding in the partitions was to be trussed to prevent sagging. That was not done. The piers in the basement were to have been directly under the partitions above, but in many instances they were from fourteen to twenty-two inches to one side. Two-by-four pieces were nailed to the lower edge of the sills, frequently only with a nail in each end, and the joists rested on those two-by-fours. Consequently, in some places there was danger that the building would not support itself. The roof joists were made of promiscuous pieces of various lengths, which were spliced together. The roof had been constructed of much cheaper material than that required. It had sagged and a pond had formed in one place. The roof was in a leaky condition all over the building. For the purpose of deadening sound, felt was to be placed in the various floors, but so little was used that it failed entirely to answer the

purpose for which it was intended. The cement work in the basement was worthless. When brick walls were cut through, it was found that the brick in either side of the wall were regularly laid but in the center of the wall they were standing on end. The cap-stones on the piers that supported the main walls of the building were inferior in quality and were crumbling away. The brick in the sides of the piers were splitting, and upon investigation it was found that the bricks on the inside of the piers had been laid in the same manner as those in the interior of the walls above referred to. In one instance one of the piers was found to be filled with rubbish. The result of this method of construction was that the weight of the walls caused the piers to settle and break down. Iron beams placed on the cap-stones to support the walls above openings were not of proper quality and when placed were not true. The steam plant was in bad order. The pipes in a number of instances had never been properly put in or had sagged so that they trapped themselves. In cold weather the rooms could not be comfortably warmed. The plastering was badly cracked and in many places had to be removed. Brick which were of an inferior quality had been used and numerous other defects were pointed out, with detailed estimates of the amount which the value of the building was lessened by faults in material and construction. This testimony, including the estimates, is too lengthy to be wholly reproduced in an opinion. Mr. Ilett and Mr. Lowden were able to give satisfactory reasons for their conclusions. Their testimony is convincing. Mr. Ilett states that after the work done under the direction of the arbitrators had been completed the building was worth $130,000 to $140,000 less than it would have been had it been constructed in accordance with the plans and specifications. Mr. Lowden fixes the value of the building after the arbitrators had finished the work done under the direction of Shields & Cook at $125,000 to $140,000 less than

it would have been had it been completed according to the plans and specifications. Mr. Tapper, the third arbitrator, testified that the value of the building after the changes were made by the arbitrators was $135,000 to $150,000 less than it would have been had it been constructed as required by the contract. Mr. Burnham was a witness. He did not fix the value of the building as completed. He stated that he was at the building about November 11, 1892; that while he did not make a thorough examination, he saw that the building had settled in a great many places; the floors were not level; dimension stone was not put in as required; the main bearing studding, which should extend up through the joists, were improperly cut off underneath the joists, which allowed each floor to settle, cracking the plastering badly, and some piers had no foundations but loose stones, which also caused a settling. He further testified that the steam heating plant varied greatly from the specifications in so many places that he could not enumerate them all, and that various other defects existed. Many changes were made in the plans and specifications by the architects, which reduced the cost of construction. The testimony of Mr. Caruthers, Mr. Shields and Mr. Cook indicates that the building was constructed according to plans and specifications as originally made or as afterward changed by the architects. The great preponderance of the evidence shows, however, that the building was not constructed in substantial compliance with the contract, either in regard to workmanship or material. When Shields & Cook are charged with the money ($43,294) paid out by the Mecca Company for material and work which the arbitrators had furnished and performed under the authority given them by Shields & Cook, the amount of the balance claimed by them is $101,061.38. This is less than the amount that should still be charged against them on account of defects in construction and workmanship and on account of changes made in the plans and specifications by the architects, whereby the

cost of the building was decreased. Consequently there is nothing due them.

Certain immaterial statements of alleged fact, principally without foundation in the record, have been pressed upon our attention by solicitors for Shields & Cook and solicitors for the Sorgs. We are told, on the one hand, that Sorg's wife and children are non-residents, and took a deed to this property shortly before his death to avoid taxation upon the succession, and that to deny Shields & Cook a lien is to give to these non-residents property worth a half million dollars for much less than its real value; while we are assured, on the other hand, that by reason of the faulty construction of the building by Shields & Cook, who are said not to have been practical builders, and by reason of the large sums which Sorg was compelled to pay to relieve the property of back taxes and for repairs immediately upon the forfeiture of the lease, the total amount he invested was much greater than the actual value of the property. Citizens of other States have precisely the same rights in this court as residents. They will be accorded nothing less and nothing more. Whether Sorg sought to avoid the inheritance tax has nothing to do with this case. Whether he did or did not invest money in the property in excess of its value is likewise a matter of indifference .

The assignments of error which question the action of the circuit court in decreeing interest to the appellees whose claims for liens were held valid cannot be sustained. We think the balance due Lowden and Ilett's representatives, for which they are entitled to a lien, is to be regarded as due upon a contract in writing, and that balance will therefore bear interest at the statutory rate.

The judgment of the Appellate Court in *Sorg et al.* v. *Crandall et al.* (No. 5298,) and the judgment of that court in *Shields et al.* v. *Sorg et al.* (No. 5300,) will be affirmed. The judgment of the Appellate Court in *Lowden et al.* v. *Sorg et al.* (No. 5299,) and the decree of the circuit court

so far as it pertains to that case, will be reversed and the cause will be remanded to the circuit court, with directions to enter a decree in favor of Lowden and the personal representatives of Ilett, establishing a lien in their favor for the sum of $280.93, with interest at five percentum per annum thereon from May 27, 1893, and providing for the enforcement of that lien.

*Affirmed in part and reversed in part.*