LINDA CNOTA, Plaintiff-Appellant, v. PALATINE AREA FOOTBALL ASSOCIATION *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—90—0861

Opinion filed March 20, 1992.

Eugene F. Keefe, of Roddy, Power & Leahy, Ltd., of Chicago (Alan D. Kalinoski, of counsel), for appellant.

Dale W. Bruckner, of Peregrine, Stime, Newman, Ritzman & Bruckner, Ltd., of Wheaton, for appellees.

JUSTICE GORDON delivered the opinion of the court:

Plaintiff Linda Cnota, a waitress, fell and injured herself when she allegedly tripped over coats dropped on the floor by customers, a group of young football players with their families. Plaintiff filed a personal injury action against defendant Palatine Area Football Association (PAFA or the Association) and against defendant John Rudolph, president of PAFA, and defendant Linda Beckman, the mother of one of the team members as "representatives" of the Association. The trial court entered summary judgment in favor of defendants, and plaintiff appeals from that judgment.

The complaint, filed December 23, 1988, alleges that on November 15, 1987, plaintiff worked as a waitress at a restaurant named Ye Olde Town Inn. The Palatine Area Football Association, an unincorporated voluntary association, had "reserved a portion" of the restaurant for its "sole use." The complaint alleged that defendants Rudolph and Beckman were "representatives of that unincorporated voluntary association."

The complaint alleges further that "defendants undertook to voluntarily change the configuration of the tables and chairs and other restaurant equipment for their sole use." Defendants also "undertook to voluntarily place their coats and other garments on or about the aforesaid chairs and equipment." Defendants violated their "duty to utilize ordinary care in the performance of these undertakings" and were negligent in the following manner:

> "a. Failed to arrange the tables and chairs and other equipment so as to allow a clear and unimpeded path for Plaintiff to walk through in performing her duties;
>
> b. Failed to arrange the tables and chairs and other equipment so as to allow Plaintiff a clear line of sight to clothing and other garments which were on the floor alongside the chairs and tables;
>
> c. Failed to properly hang or support their clothing and other garments so that they would not fall to the floor in a fashion which could not be seen or detected by Plaintiff;
>
> d. Failed to pick up clothing and other garments from the floor after the aforesaid clothing had fallen in a fashion which could not be seen or detected by Plaintiff; [and]
>
> e. Failed to warn Plaintiff of the hazardous and dangerous condition present due to the presence of hidden clothing and other garments on the floor."

The complaint alleges further that plaintiff "could not and did not see the aforesaid clothing *** which had fallen to the floor in the narrow corridor created by Defendants due to their voluntary rearrangement of the tables and chairs of Plaintiff's employer." Plaintiff, therefore, "tripped and fell over the aforesaid hidden clothing" and was injured.

In its answer, filed March 3, 1987, defendants responded to the allegation that PAFA was a voluntary association and the individual defendants were "representatives" of the Association:

> "Paragraph 2 merely states a legal conclusion and therefore no response is required thereto. If any response is required Defendant denies the allegations in paragraph 2 and each of them."

On May 23, 1989, defendants filed a motion for summary judgment, arguing that the Association could not be held liable for torts of individuals when it had no control over their acts. Attached to defendants' motion for summary judgment was an affidavit of Christopher Childers, the team's coach, stating that Childers was never an officer or employee of PAFA. Childers stated further that the pizza party "was not a pizza party given on behalf of the Association." Instead,

the pizza party "was an informal gathering organized by some coaches and parents of members of the White Team, a single team belonging to the Association." Childers also stated that "[n]o officer or representative of the Association organized the pizza party on the Association's behalf." The affidavit continued:

"Only some of the White Team members were present at the pizza party along with their coaches, as well as some brothers, sisters, parents and friends.

Each parent of a team member paid for pizza and refreshments consumed by himself and his children. The Association made no payment or contribution toward the purchase of same.

The Association did not organize, sponsor, or in any way become involved in making arrangements for the subject pizza party."

Beckman testified at her deposition that she volunteered to arrange a party for the end of the season.

"A. Well, in '86 I knew the kids had a party, you know, the team had a party. So one of the mothers was coming around—now we're talking '87—*** [and] I asked her if she heard of anything about if we were having any kind of a party for the boys, and she said no.

So then I went up to Chris Childers and I asked him if there was going to be any party because none of us had heard anything, and he said I really haven't had time to do it. And I said would you like me to do it? And he said would you mind? And I said no, and that was it.

Q. And what did you do?

A. Well, it seemed like the kids had a good time at the Olde Town Inn from the year before when we went. It seemed like it went real smooth, so I went back there."

Beckman testified that shortly before the party, she went into the restaurant and spoke with plaintiff, and told plaintiff that "the football team" wanted a party "like last year." Plaintiff gave her the manager's telephone number. Beckman later telephoned the manager and said she wanted "to have a football party at his place like they had last year." The manager referred her to the head waitress. Beckman later telephoned the head waitress.

"A. And I spoke to her about it. I asked her her suggestions on it, if they can accommodate about 60 to 70 people, because she was asking me how many people; and I told her we were all paying our own tab. ***

* * *

Q. *** Do you recall if you made a reservation in any specific name?

A. No."

Beckman testified that on the day of the party, she arrived at the restaurant with her son. The bartender told Beckman that "I had to supervise the children—there had to be an adult supervision [sic] in the bar area with the children." At one point, Beckman asked plaintiff "if we could have it so the team could sit together like they did last year, the previous year, and she said yes." Then plaintiff "and one of the cooks I guess came out and they rearranged the table[s]." Beckman did not see anybody else assist them in the rearranging.

Beckman testified that approximately 60 people attended, 25 of whom were the team members. Beckman remained in the entryway, "[w]atching the kids in the bar area." Beckman explained: "There's a cement floor and it's slippery, and that's why the bartender asked me to supervise because they would trip and fall, and they didn't want them running around." The participation trophies were given out, taken from a box which the coach had with him, and the coach was given a gift from the team members.

Beckman testified that if one of the boys misbehaved at the party, "[h]opefully the parents would [intervene] if they were there with their children." If the parents were not there, Beckman herself would say something.

Beckman did not see plaintiff fall on November 15, 1987. When she was told about the fall, Beckman "ran from the bar area into where she was at." Beckman asked plaintiff what happened, and plaintiff "said she tripped." She did not indicate what she tripped on. "My understanding is she was serving drinks, and she tripped on the leg of a chair and fell back, hit the wall and fell."

Beckman testified that coats and garments were hung up on a "long wooden coat fixture, you know, with the hooks on it like this (indicating) and people hung up their coats up there." She does not recall whether any coats were put on the backs of chairs. She did not see any coats or garments on the floor.

Beckman testified further that she was not an officer in PAFA. She did not know when the Association began; its purpose; its structure; whether it had employees; whether it existed on a year-round basis; whether it was affiliated with other associations; when it had meetings; how it was funded; who the officers were; or what its activities were. No "representative" of the Association was at the party.

"There was just the coach, the team, and the parents and friends or other family members."

Beckman also testified that at some point after the accident, plaintiff telephoned her. "She said she was going to sue the Olde Town Inn and she needed witnesses," and therefore wanted the coach's name and phone number.

In her response to the motion for summary judgment, plaintiff relied upon the deposition of Joseph H. Chambers, the current president of PAFA. Chambers testified that the purpose of PAFA was to "provide a youth football program for children in the Palatine area community." The PAFA provides athletic equipment to the boys. Chambers did not know Beckman. She never played a role with PAFA. "She has played no role. In other words, I don't know who the person is." PAFA had never sanctioned any player for misbehaving at an outing such as an end of the season party. Chambers was not aware that the November 15, 1987, pizza party was being held. No officers were present at the party.

Chambers testified that PAFA commonly uses its funds to purchase annual player participation awards for distribution to players; that PAFA commonly gives the player participation awards to all head coaches for distribution; and that PAFA knew that these awards were typically given to the players by the coach, and that "the time, nature and site of this event is left to the discretion of the individual coaches." Chambers also testified that commonly the awards are given at events or parties similar to the September 15, 1987, pizza party "at restaurants and are organized by coaches or volunteer parents"; that commonly the awards bear the name of PAFA; and that commonly the team players, coaches and parents wear PAFA garments at such parties. Chambers testified further that each child pays for the cost of the plaque. "It's part of his registration fee. He gets a participation plaque." No other awards are given.

In Chambers' affidavit, he stated that PAFA had never been requested to, and did not have the authority to, "sanction, authorize, organize, sponsor, or otherwise have any involvement with any post season party, gathering or activity undertaken by any team or teams within the PAFA."

Plaintiff also relied upon her own affidavit, which states that prior to November 15, 1987, she was contacted at work by Linda Beckman. At that time, Linda Beckman said that she was a parent of "one of the players in the PAFA." Beckman told plaintiff "that she wanted to schedule another party similar to the party held by the [PAFA] at the

same restaurant the preceding year." Beckman stated that the "party was for" PAFA.

Plaintiff's affidavit states further that the restaurant manager told plaintiff that Beckman "had contacted him and finalized the reservations and requested that the reservations for the party be in the name of the 'Palatine Area Football League.' "

Plaintiff also states in her affidavit that on November 15, 1987, Beckman arrived at the restaurant and "told me that she was at the restaurant on behalf of the" PAFA, and that "she was going to stand in the foyer and direct members of the [PAFA] into the appropriate room for the party." Plaintiff observed many of the people at the party wearing PAFA jackets, and saw awards with the PAFA name printed on them sitting on a table.

On February 27, 1990, the trial court granted defendants' motion for summary judgment.

OPINION

Plaintiff contends that the trial court erred in entering summary judgment for defendants because genuine issues of material fact remain regarding the relationship between PAFA, Coach Childers and Beckman. Summary judgment is proper where the pleadings, affidavits and depositions on file establish that there is no genuine issue of material fact. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005; *Campbell v. Haiges* (1987), 152 Ill. App. 3d 246, 249, 504 N.E.2d 200.) In deciding a summary judgment motion, the trial court may not weigh the evidence. (*Miller v. Smith* (1985), 137 Ill. App. 3d 192, 198, 484 N.E.2d 492 ("While the trial court apparently believed that the evidence submitted by plaintiffs was more probative than that proferred by defendants, such weighing and appraising of the evidence is improper on a summary judgment motion"); *Fletcher v. Boxx* (1973), 10 Ill. App. 3d 928, 295 N.E.2d 248.) There is no genuine issue of material fact where there is no dispute as to the material facts and reasonable persons could not draw different inferences from the facts. *Taylor v. City of Beardstown* (1986), 142 Ill. App. 3d 584, 491 N.E.2d 803; *Zanzig v. H.P.M. Corp.* (1985), 134 Ill. App. 3d 617, 480 N.E.2d 1204.

■ Generally, an association is not liable for the torts of its members when it has no control over the members' acts.

> "An association may not be held liable for torts of a member when it has no control over his acts ***. Also there is no liability for injuries suffered by a third person when the association has no control over the operation of the premises where injury occurred." 7 C.J.S. *Associations* §38, at 88 (1980).

Here, the PAFA bylaws indicate that Childers, as a coach, was a "member" of the Association. However, PAFA had "no control over" the coach's choice of the location where he would distribute the plaques. Chambers testified that the coaches could hand out the plaques anywhere; for example, at the coach's home, at a community center, at a pizza party, at a horseback riding party, or at a local playground. "The list goes on and on and on. *** [I]t's really up to the coach's discretion how he disseminates them." The bylaws gave PAFA no authority to dictate the means of distribution of the plaques and no authority to dictate any decisions related to an end-of-the-season party. PAFA also had no control over Beckman's request to plaintiff that the chairs and tables be rearranged since PAFA had "no control over the operation of the premises where the injury occurred."

Plaintiff argues, however, that the dinner was "organized and arranged by agents or representatives of the" Association. Unlike Childers, Beckman was not a "member" as defined by the PAFA bylaws. Thus, for Beckman's negligence to be imputed to PAFA, Beckman would have to be an agent or representative of PAFA.

While the existence of an agency relationship is generally a question of fact, it becomes a question of law where the parties' relationship is so clear as to be undisputed. (*Perkinson v. Manion* (1987), 163 Ill. App. 3d 262, 516 N.E.2d 977; *In re Estate of Rice* (1985), 130 Ill. App. 3d 416, 473 N.E.2d 1382.) We believe that under the facts presented here, the relationship between Beckman and PAFA is so clear as to be undisputed. Beckman and PAFA had never had any contact and neither one was aware of the other's role, if any, in the football league. PAFA had no control or authority over Beckman's conduct.

Plaintiff argues, however, that because defendant Childers, as a coach, was a "member" of the Association, and Childers, "in turn, enlisted Linda Beckman *** to assist in organizing the awards function," this made Beckman "a sub-agent or a special agent."

Generally, "[a]n association may not be held *** responsible for the negligence of a third person employed by a member in the prosecution of the member's business." (7 C.J.S. *Associations* §38, at 88 (1980).) Under general agency principles, however, the appointment of an agent may be made through another person, such as when the principal and primary agent agree that the agent will employ another agent. (*Sorg v. Crandall* (1908), 233 Ill. 79, 84 N.E. 181; *Purgett v. Weinrank* (1920), 219 Ill. App. 28; *American Express Co. v. Stuart* (1907), 134 Ill. App. 390.) Generally, an agent cannot delegate his authority and have the services performed by a subagent without ex-

press permission from the principal unless the permission can be implied from the nature of the business or custom. *Doggett v. Greene* (1912), 254 Ill. 134, 98 N.E.219; *Sorg v. Crandall*, 233 Ill. 79, 84 N.E. 181.

There is nothing in the record indicating that PAFA empowered Childers or any coach to enlist the help of other people to help him with his football-related duties on behalf of PAFA.

Nevertheless, even if Childers could appoint Beckman as a sub-agent, because PAFA's permission for coaches to delegate tasks to parents might be implied from the nature of the football organization, PAFA could not be held liable for Beckman's conduct.

The parties agree that Beckman's status as a volunteer does not preclude her from being an agent of PAFA. The Restatement (Second) of Agency, section 225 (1958), states:

> "One who volunteers services without an agreement for or expectation of reward may be a servant of the one accepting such services."

However, Comment *b* to section 225 explains:

> "In determining whether or not one rendering gratuitous assistance to another is a servant, the purpose for which the former acts may be important." Restatement (Second) of Agency §225, Comment *b* (1958).

The purpose for which Beckman acted, in making reservations and in asking that the tables be rearranged, did nothing to further the purpose underlying the existence of the Association, *i.e.*, to provide a youth football program for the community. The pizza party was not sponsored by the PAFA. In *Harvey v. Ouachita Parish School Board* (La. App. 1989), 545 So. 2d 1241, the court affirmed summary judgment for the defendant school athletic association where plaintiff, a high school football player, was injured during a school football game against a team which had a reputation for engaging in excessive physical contact. The court found that the football association was nothing more than an instrument, the purpose of which was "to provide a framework under which high school athletic contests [could] be conducted and to promote sportsmanship in high school athletics." (*Harvey*, 545 So. 2d at 1245.) The school, not the athletic association, conducted the games and hired the officials. The court held that the officials were not agents of the athletic association. Similarly, here PAFA is simply a structure used for organizing the team competition. PAFA does not conduct end-of-season parties.

PAFA did not recruit Beckman to organize the party. It would require a tortured reading of the facts here to find that the pizza party

was somehow essential to the functioning of the football league. Moreover, PAFA did not have any right to summarily terminate Beckman's self-appointed volunteer task of making reservations for the pizza party. There is also nothing in the record to show that this type of volunteer activity is customarily rendered on behalf of the PAFA.

(For various factors considered by courts in determining the liability of charitable organizations for the conduct of their volunteers, see generally Annot., *Liability of Charitable Organization Under Respondeat Superior Doctrine for Tort of Unpaid Volunteer* (1978), 82 A.L.R.3d 1213; Annot., *Liability of Youth Camp, Its Agents or Employees, or of Scouting Leader or Organization, for Injury to Child Participant in Program* (1978), 88 A.L.R.3d 1236; Annot., *Liability of Member of Unincorporated Association for Tortious Acts of Association's Nonmember Agent or Employee*, 62 A.L.R.3d 1165 (1975).)

An example of a factual setting from which agency could be inferred, unlike the present case, is seen in *Odessa School District No. 105 v. Insurance Co. of America* (Wash. App. 1990), 791 P.2d 237, 240-41, where the court found that the school track team's pizza party was an activity sponsored by the school district and thus covered under the relevant insurance policy. The court pointed to the fact that there was a "morale building" factor inherent in the pizza gathering because it supported those athletes who were about to compete in the district and State competitions; the school principal had preapproved the party; and a school bake sale was held to raise funds to support the activity.

In contrast, no officer of PAFA approved the September 15, 1987, party or even knew of it. Moreover, the Association did not sponsor any activity to raise funds for the pizza party, and no funds were provided by PAFA. Instead, each family paid for its own pizza and drinks.

As we have discussed, PAFA did not have the right or duty to supervise or control the pizza party. Beckman, a mother of one member of one particular team in PAFA, arranged to have the team members and their families have pizza together at the end of the season. PAFA officers had no connection with either Beckman or the restaurant. *Cf. Dumas v. Lloyd* (1972), 6 Ill. App. 3d 1026, 1029, 286 N.E.2d 566 (*prima facie* case of agency relationship established where evidence shows agent's authority was limited by owner of service station, who frequently visited the premises, laid down certain rules, owned all the equipment, set the prices, had his name on all records and accounts, and terminated the relationship with the agent).

We are aware of no case holding that a restaurant customer who merely made reservations at the restaurant for her son's football

team becomes an agent of her son's football association simply by making the reservation at the restaurant or by asking that the tables be rearranged so the group could sit together.

In addition, there can be no apparent or implied agency here, since there were no words or actions alleged by the plaintiff, including Beckman's making a reservation or asking that the tables be pulled together, which would lead a reasonably prudent person to believe Beckman was acting under the authority of PAFA in asking that plaintiff rearrange the tables and chairs. See *Goodknight v. Piraino* (1990), 197 Ill. App. 3d 319, 326, 554 N.E.2d 1 (customer of tavern who brought pitcher of beer to table where she sat with plaintiff did not become agent of tavern, either under a theory of implied agency or apparent agency).

Plaintiff finally argues that, even if defendants are correct in their contention that Beckman was not acting as an agent of PAFA, liability would still exist due to the "Defendant Association's ratification of the awards function." Thus, PAFA would nevertheless be liable because it knew that coaches typically handed out the participation awards at a restaurant yet it said nothing. As defendants demonstrate, this contention was not presented to the trial court and is therefore waived. However, even if properly preserved, the argument is not persuasive.

■ A party cannot be deemed to ratify conduct to which it is a total stranger in the first instance. "Ratification is a form of equitable estoppel involving the express or implied adoption of the acts of another by one for whom the other assumes to be acting, even without authority. At the heart of the doctrine of ratification is the concept that the person ratifying obtains a benefit, and that the benefit is obtained through the actions of a person that is acting in his behalf with apparent or implied authority." *Swader v. Golden Rule Insurance Co.* (1990), 203 Ill. App. 3d 697, 704, 561 N.E.2d 99, citing *In re Marriage of Jackson* (1989), 179 Ill. App. 3d 479, 484, 534 N.E.2d 687; *Mateyka v. Schroeder* (1987), 152 Ill. App. 3d 854, 866, 504 N.E.2d 1289; *Hofner v. Glenn Ingram & Co.* (1985), 140 Ill. App. 3d 874, 883, 489 N.E.2d 311; *Advance Mortgage Corp. v. Concordia Mutual Life Association* (1985), 135 Ill. App. 3d 477, 484, 481 N.E.2d 1025.

Only if the act is performed by someone purportedly acting on behalf of a "principal" can the acquiescence of the putative principal constitute ratification. Thus, a case for ratification cannot be bootstrapped upon the acts of strangers who do not profess to be acting on behalf of another.

Moreover, ratification may be inferred from silence only when the principal has full knowledge of all material facts. (*Rouse Woodstock, Inc. v. Surety Federal Savings & Loan Association* (N.D. Ill. 1986), 630 F. Supp. 1004; *Swader v. Golden Rule Insurance Co.*, 203 Ill. App. 3d 697, 561 N.E.2d 99; *Reavy Grady & Crouch Realtors v. Hall* (1982), 110 Ill. App. 3d 325, 442 N.E.2d 307.) Ratification will not be implied from a principal's acts where at the time he was not fully informed of the facts. *Arthur Rubloff & Co. v. Drovers National Bank* (1980), 80 Ill. App. 3d 867, 400 N.E.2d 614.

Here, PAFA possessed only the most general knowledge that typically some coaches, team members and their families had a party at the end of the season. We do not believe that this qualifies as "full knowledge of all material facts." PAFA certainly did not possess knowledge that Beckman had made reservations at a particular restaurant, or that she asked that the tables be rearranged. Thus, there is no ratification.

We conclude that the trial court properly found that there are no general issues of material fact regarding the vicarious liability of PAFA or its president, defendant Rudolph, or defendant Beckman as an alleged agent of PAFA.

■ In addition, the gravamen of the complaint is that Beckman, as the only named defendant present in the restaurant, was negligent in moving the chairs and tables, "so as to allow a clear and unimpeded path," and then failing to "pick up clothes and other garments" which had fallen onto the floor. Plaintiff argues that Beckman, "under the authority of Coach Childers, voluntarily undertook to have the tables and chairs rearranged into a specific configuration for the awards function."

However, Beckman testified that it was actually plaintiff and a cook who moved the tables and chairs, at the request of Beckman. Plaintiff filed no counteraffidavit or deposition testimony to refute this. When a deposition is used in support of a motion or response to a motion for summary judgment and is not contradicted by a counteraffidavit or deposition, the sworn testimony in the deposition must be accepted as true for purposes of the motion. (*In re Estate of Myers* (1983), 120 Ill. App. 3d 726, 458 N.E.2d 1102.) Thus, depositions may be used in lieu of a counteraffidavit to oppose summary judgment motions. *Abel v. General Motors Corp.* (1987), 155 Ill. App. 3d 208, 507 N.E.2d 1369; *Stando v. Grossinger Motor Sales, Inc.* (1980), 89 Ill. App. 3d 898, 412 N.E.2d 600.

It is axiomatic that a principal cannot be made liable through the doctrine of *respondeat superior* when the agent's actions in no way

constitute negligence. (*Dumas v. Lloyd* (1972), 6 Ill. App. 3d 1026, 286 N.E.2d 566.) There is no fundamental distinction between liability of a principal for the tort of an agent and liability of a master for the tort of his servant. *Warren v. LeMay* (1986), 142 Ill. App. 3d 550, 491 N.E.2d 464.

We also note the holding in *Loosier v. Youth Baseball & Softball, Inc.* (1986), 142 Ill. App. 3d 313, 491 N.E.2d 933, where this court affirmed summary judgment for the defendant baseball organization where the complaint alleged that the minor plaintiff was injured while selling raffle tickets to finance the costs of the baseball program, stating: "While defendant has a duty to supervise the activity of [football] games while the players are on the field actively participating in the sport and entrusted by their parents to their coaches, we are unwilling to conclude that they are required to supervise those same players" when they are selling raffle tickets and "while they are under the care of their parents." (*Loosier*, 142 Ill. App. 3d at 318.) The court went on to declare:

> "To the extent that public policy enters into the analysis, no reasons sounding in public policy would require that a duty of continuous protection be imposed. Youth Baseball provides a service to the community by sponsoring sports activities for young people *** and it raises money for these activities by the sale of raffle tickets by its members on a voluntary basis. *** We find that public policy does not require that citizens, who do volunteer work in coaching baseball and softball teams, provide supervision of all team members at the time when a team member is engaged in the activity of selling a raffle ticket. We find that the contrary is dictated by public policy, because such a requirement would impose an unreasonable burden upon those who operate and sponsor the Youth Baseball program." (*Loosier*, 142 Ill. App. 3d at 317-18.)

The court in *Loosier* noted that the "only involvement of Youth Baseball was that it had provided the tickets that [the minor] was selling with the permission of and while in the care of his parents. Under these circumstances, we find that Youth Baseball has no duty of supervision and affirm the trial court's entry of summary judgment in defendant's favor." (*Loosier*, 142 Ill. App. 3d 313, 491 N.E.2d 933.) Similarly, even if a basis for vicarious liability were shown here, we would question whether we would support imposition of liability on PAFA, which provides a community service by sponsoring football for young people, for not supervising the way in which team members and their families hung up their coats or asked to have their tables

arranged when they gathered at a restaurant for an end-of-the-season pizza party.

In conclusion, we hold that the trial court properly entered summary judgment in favor of defendants where the affidavits, depositions and pleadings on file established that no genuine issue of material fact existed.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

LORENZ and MURRAY, JJ., concur.