2023 IL App (1st) 211661-U

No. 1-21-1661

Order filed January 18, 2023

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| CORE MECHANICAL, INC., an Illinois Corporation, and LISA SHEEHY, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs, | ) ) | |
| (Core Mechanical, Inc., Plaintiff and Counterdefendant-Appellee; and Lisa Sheehy, Plaintiff-Appellee) | ) ) ) | |
| v. | ) ) | |
| JR INDUSTRIES, LLC, an Illinois Limited Liability Company, and JESSE RICHARDSON, | ) ) ) | |
| Defendants, | ) ) | No. 17 CH 617 |
| (JR Industries, LLC, Defendant and Counterplaintiff-Appellant; and Jesse Richardson, Defendant-Appellant). | ) ) ) | |
| JESSE RICHARDSON, | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) | Honorable Pamela McLean Meyerson Judge presiding. |
| BRIAN SHEEHY and JERRY SHEEHY, | ) | |

No. 1-21-1661

_____

        JUSTICE BURKE delivered the judgment of the court.
        Justices Lavin and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the circuit court's entry of summary judgment in favor of Core Mechanical, Inc., and Lisa Sheehy where there was no genuine issue of material fact that Core Mechanical, Inc., satisfied the conditions precedent of a lease agreement's option to purchase thereby entitling it to specific performance of the option to purchase from JR Industries, LLC.

¶ 2    A series of interrelated agreements resulted in Jesse Richardson selling his interest in Core Mechanical, Inc. (Core), to Lisa Sheehy. One of the agreements required Core to lease the building where it operated from JR Industries, LLC (JR), a company of which Richardson was the sole member. As part of that lease agreement, Core had the option to purchase the property so long as it satisfied various conditions precedent, including one involving compensation to Richardson. Believing that those conditions were satisfied, Lisa Sheehy and Core attempted to exercise the option to purchase. Richardson and JR, however, disagreed and implicitly rejected Lisa Sheehy and Core's exercise of the option. As a result, Core sued JR seeking specific performance of the option to purchase and alleging breach of contract. Later, Lisa Sheehy became a plaintiff in the litigation, and ultimately, on her and Core's fifth amended complaint, the parties filed cross-motions for summary judgment.

¶ 3    In resolving the cross-motions for summary judgment, the circuit court found that the conditions precedent in the lease agreement, including the one involving compensation to Richardson, had been satisfied and concluded that Core was entitled to exercise the option to purchase the property. In turn, the court granted Core and Lisa Sheehy's motion for summary

judgment and denied JR's motion. Subsequently, the court entered an order setting the terms of the purchase and sale of the property. JR and Richardson have appealed and contend that the court erred in granting summary judgment in favor of Core and Lisa Sheehy. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 4                                   I. BACKGROUND

¶ 5      In 2015, Core operated as a commercial heating, ventilation, and air conditioning (HVAC) and plumbing contractor out of a building on West Montrose Avenue in Chicago. At the time, Core's sole shareholder was Richardson, who also was a member of the Pipe Fitters Association, Local Union 597 U.A. (Local 597). Core operated as a contractor for the union, meaning it hired union members as employees. The relationship between a union contractor, such as Core, and Local 597 was governed by an area agreement. The area agreement defined the manner in which contractors paid union members, including that they be paid weekly. Generally, the standard work day began at 8 a.m. and ended at 4:30 p.m., which included a half-hour, unpaid lunch break. In addition, a regular work week consisted of 40 hours of work for five days, beginning on Monday and ending on Friday. Any work performed beyond the standard work day or standard work week was paid at premium rates.

¶ 6      Additionally, the area agreement contained a grievance process through which a union member could address grievances with his or her employer. Under that process, the purportedly aggrieved member had to submit his or her grievance in writing to specified people within three business days after the grievance arose. However, according to deposition testimony of Michael Maloney, Local 597's president and collection coordinator for the union's benefit funds, even when the three-day time period had elapsed, Local 597 would still "[i]nformally" address the grievance. The area agreement provided six holidays—New Year's Day, Memorial Day, the

Fourth of July, Labor Day, Thanksgiving Day and Christmas Day—that had to be recognized by union contractors, meaning these days could not be standard work days. This provision, however, merely provided a minimum time off, as union contractors could offer their employees additional holidays off.

¶ 7    In the fall of 2015, JR purchased a commercial building on West Lawrence Avenue in Chicago to act as Core's operation center. According to deposition testimony of Jerry Sheehy, Lisa's husband and an employee of Core, the building on West Lawrence Avenue suited Core's needs well due to its size, location near highways and its proximity to Core's customer base. After JR purchased the property, the building underwent renovations to further suit Core's needs. Core moved into the building a few months later. In late 2015, Richardson and Lisa Sheehy were finalizing negotiations for her to acquire Core. Brian Thompson represented Richardson, and Richard Carbonara represented Lisa Sheehy. Once the parties had agreed upon the critical terms of the transaction, Michael Roti, an attorney and certified public accountant, helped consummate the transaction, including by drafting the requisite transactional documents.

¶ 8    On December 31, 2015, Richardson and Lisa Sheehy signed a binding letter of intent that outlined the transaction of her becoming Core's new owner. The letter of intent indicated that the parties would execute a stock purchase agreement through which Lisa Sheehy would acquire all of the shares of Core in exchange for $645,000. In addition, the parties agreed that:

"[Richardson] shall remain on the payroll as an employee of Core, subject to an agreement ('Employment Agreement'), through December 31, 2018. The Employment Agreement shall define the terms of employment and shall guarantee [he] be paid at a rate of $50 per hour for 2080 hours annually and shall include

paying all Union 597 'back-end' benefits through the end of 2016 ('Guaranteed

Minimum 2016 Compensation')."

Further, the parties agreed that, "[i]n addition to the Guaranteed Minimum 2016 Compensation, [Richardson] shall be paid $75 per hour for actual hours worked during 2016 and receive a profit split of at least thirty-five per cent (35%), to be determined on a job-by-job basis, with reasonable and customary expenses allocated, for each job procured by [him]." Additionally, Core had to pay JR for expenses related to an airplane JR owned as well as enter into a lease agreement with JR to rent the commercial property that JR had recently purchased. According to the letter of intent, the lease agreement had to "include an option, at [Lisa Sheehy's] discretion, to purchase the land and building, upon the full satisfaction of the Note in the Stock Purchase Agreement and the Guaranteed Minimum 2016 Compensation in the Employment Agreement, at a price equal to the then current outstanding mortgage balance from Chase Bank." The letter of intent also required Core to "maintain[] full responsibility for all accounts payable, and other monetary obligations due on the date of [the] Letter of Intent and prospectively." Finally, the letter of intent provided that Anna Richardson, Jesse's wife who was employed by Core in its office, would cease being an employee of Core and be removed from its "payroll effective December 31, 2015."

¶ 9      As contemplated by the letter of intent, the stock purchase agreement reflected that Lisa Sheehy would pay Richardson $645,000 to acquire all of the shares of Core, paid through a cash down payment of $50,000 and a promissory note of $595,000. The stock purchase agreement further provided that Core would retain Richardson as an employee subject to an employment agreement and provided for additional compensation to Richardson indirectly through payments to JR for expenses related to the airplane JR owned and through the lease agreement. The stock purchase agreement also stated that Anna Richardson would cease being an employee of Core and

be removed from its payroll effective December 31, 2015. As part of the stock purchase agreement, Brian Sheehy, Lisa's brother-in-law, executed a personal guaranty to pay all money owed under the agreement.

¶ 10    Also as contemplated by the letter of intent, Richardson and Core executed an employment agreement, whereby Core agreed to hire him as a Local 597 journeyman, a class of pipe fitter, for a term of three years commencing on January 1, 2016, subject to the agreement's termination provisions. The employment agreement provided that, from January 1, 2016, through December 31, 2016, Core would pay Richardson "Fifty Dollars ($50.00) per hour, forty hours per week, payable each week." The employment agreement further provided for Richardson's compensation in 2017 and 2018. The employment agreement required Core to "pay all Union 597 'back-end' benefits on behalf of [Richardson]." Either party could terminate the employment agreement with 30 days' written notice. However, if Core terminated the employment agreement, Richardson still would be guaranteed his compensation through December 31, 2016. Similarly, if Richardson committed a violation of the terms of the employment agreement, Core could terminate him without notice, but he would still be guaranteed compensation through December 31, 2016. Lastly, other provisions of the employment agreement involving the possibility of Richardson's disability or death guaranteed payment to him or his estate, respectively, through December 31, 2016.

¶ 11    According to various evidence in the record, including acknowledgements by Richardson himself, the $50 per hour compensation that Core owed Richardson in 2016 was owed regardless of whether he worked any actual hours. Additionally, various evidence in the record, including contribution summaries of Local 597's benefit funds and wage letters issued by the Mechanical Contractors Association, an organization representing union contractors, and Local 597, explained that the back-end benefits were six funds—(1) a welfare fund, *i.e.*, health insurance; (2) a

retirement fund; (3) a defined contribution fund; (4) a labor-management cooperation committee fund; (5) a training fund; and (6) an education fund—of Local 597 that Core would pay into on behalf of its union employees. The back-end benefits were also referred to as fringe trust funds or benefit funds. In fact, Maloney, Local 597's president and collection coordinator for the union's benefit funds, testified in a deposition that he had never heard the term "back-end benefits" before. Each of the six funds had an associated rate per hour, meaning any hours reported worked by a union member would be compensable by contributions to the various benefit funds at that rate. As the back-end benefits related to Richardson, because his 40 hours per week would be reported to Local 597 as working hours and paid via direct bank deposit, Core would pay Local 597 the back-end benefits on Richardson's behalf for these hours despite the fact that Richardson did not actually work any of the hours. For any hours that Richardson actually worked, Core would pay him $75 per hour, as stated in the binding letter of intent, in cash. According to deposition testimony of Jerry Sheehy and Roti, if Core paid a union member in cash for work, Core could not report those hours to Local 597 for back-end benefits purposes. And in deposition testimony, Richardson acknowledged that he received cash compensation for any hours he actually worked in 2016.

¶ 12 The lease agreement between Core and JR stated that Core would lease the commercial property on West Lawrence Avenue for three years beginning on January 1, 2016. The recitals of the lease agreement stated that the lease was a part of a series of interrelated agreements, including an employment agreement where Richardson was "entitled to receive a minimum compensation in 2016," otherwise known as the " 'Guaranteed Minimum 2016 Compensation.' " As part of the lease agreement, Core had an option to purchase the property. That provision provided that:

"[Core], or its designee, shall have the right, at its sole discretion, to purchase the

Premises from [JR] after twelve (12) months from the date hereof and upon the full

satisfaction of the Note and the Guaranteed Minimum 2016 Compensation, unless

agreed upon sooner, in writing, by [JR]. The purchase price of the Premises shall

be the then-current outstanding mortgage balance with Chase Bank."

¶ 13    In 2016, Core continued to operate as a contractor for Local 597. As a union contractor, Core was required to pay union members minimum wages. From January 1, 2016, until May 31, 2016, journeymen pipe fitters, which Richardson was classified as pursuant to his employment agreement, were required to be paid at least $47 per hour. For the remainder of 2016, journeymen pipe fitters were required to be paid at least $47.50 per hour. As discussed, in addition to paying union members their hourly rate, Core had to contribute on their union employees' behalf to Local 597's six benefit funds. For example, for the first five months of 2016, Core was required to pay to Local 597: $9 per working hour toward the welfare fund; $9.85 per working hour toward the retirement fund; $7 per working hour toward the defined contribution fund; $0.09 per working hour toward the labor-management cooperation committee fund; $2.03 per working hour toward the training fund; and $0.31 per working hour toward the education fund. Additionally, Core had to contribute wage-work assessments, which were essentially union dues, on their union employees' behalf. Based on a wage letter signed by Local 597 and the Mechanical Contractors Association, the wage-work assessment contribution was $0.71 per hour from June 1, 2015, until May 31, 2016. However, Jillian Rymek, an auditor of Local 597, testified during a deposition that she believed another wage letter signed by Local 597 and the Mechanical Contractors Association increased that rate effective January 1, 2016. All together, for the first five months of 2016, Core was required to contribute $29.22 per working hour for the six benefit funds and the wage-work assessment on behalf of every Local 597 journeymen pipe fitter. For the remainder of 2016, due to a compensation increase, Core was required to contribute $30.83 per working hour for the six

benefit funds and the wage-work assessment on behalf of every Local 597 journeymen pipe fitter. A contractor only had to contribute these amounts to Local 597 for reportable working hours. As such, holiday time, as time off, was not reportable to Local 597 for back-end benefit purposes unless an employee actually worked on the holiday.

¶ 14    At the end of November 2016, Lisa Sheehy sent Richardson a notice of termination, which was to become effective on December 31, 2016. Over the next few weeks, Core indicated its desire to exercise its option to purchase, as evidenced by e-mails between Thompson, Richardson's attorney, and Carbonara, Lisa Sheehy's attorney. In one e-mail on December 8, 2016, Thompson noted that the "option to buy the premises [was] conditioned upon full payment of the Note and Guaranteed Minimum 2016 compensation (2080 hours + Union 597 'back-end' benefits)." According to Thompson, based on Richardson's paystub for the pay period ending on December 4, 2016, Richardson had only been paid for 1888 hours. Thompson asserted that "[t]he 190 or so missing hours [and] Union 'back-end' will need to be accounted for at closing." The following day, Richardson, individually and on behalf of JR, and Lisa Sheehy, individually and on behalf of Core, signed a release in which Richardson acknowledged full payment in satisfaction of the promissory note.

¶ 15    On December 29, 2016, Roti, who was now the secretary and treasurer of Core, e-mailed Thompson and noted that Core had received a verbal commitment from a bank on financing the purchase of the property. Five days later, in another e-mail from Roti to Thompson, Roti stated he attached copies of Richardson's paystubs through December 30, 2016, and evidence of electronic payments for Richardson's back-end benefits from Core to Local 597, which "confirm[ed] the last payments of the Guaranteed Minimum 2016 Compensation." Additionally, Roti provided calculations showing that Core paid Richardson for 52 weeks and 40 hours per week, or 2080

hours total, and paid Richardson $104,580 for 2016. Roti also asked when he would receive a payoff letter from Chase Bank so he could forward the letter to the bank Core was using to finance the purchase of the property. Roti concluded the e-mail by stating that he would let Thompson know the closing date as soon as it was scheduled. The next day, Thompson responded to Roti and provided the amount of the outstanding mortgage on the property along with the *per diem* interest. Thompson implicitly rejected Core's immediate exercise of the option to purchase by asserting:

> "[Richardson was] looking for the following items: (1) $5500 for [a snow] plow;
> (2) Loss of income re plow at $85/hour for 16 hours; (3) Legal fees; (4) Acctg fees
> (I think you indicated these were paid); (5) Credit card ($11,274.76); [and] (6)
> Union back end (9 days x 8 hours/day x $29.00/hour)."

According to deposition testimony of Thompson, his request for nine days of back-end benefits was based solely on what Richardson believed "he was shorted." In a deposition from Richardson, he testified that he believed those nine days corresponded to holidays in which Core did not contribute corresponding back-end benefits.

¶ 16    In 2016, for its union employees, Core's pay period began on Monday and ended on Sunday. Core would then pay its employees on the subsequent Friday unless that Friday was a holiday. During 2016, Core paid Richardson 52 times via direct bank deposit, beginning on January 8, 2016. In Richardson's first paystub for 2016, the pay period was from December 28, 2015, through January 3, 2016. Core paid Richardson $50 per hour for a total of 40 hours. Of those 40 hours, 24 hours were deemed regular hours and 16 hours were deemed holiday hours. During the middle of June, Richardson's hourly rate increased to $50.50 per hour. Around the same time, journeymen pipe fitters for Local 597 received a $.50 per hour pay increase. According to various testimony from Lisa Sheehy, Jerry Sheehy and Roti, Core did not have to give Richardson a similar

raise because he was already being paid above the minimum wage, but Core provided him that raise voluntarily. In a deposition from Richardson, however, he claimed that Core was required to provide him that raise. After January 8, 2016, Core paid Richardson every single week until he received his final direct bank deposit on December 30, 2016, which was based on a pay period was from December 19 through December 25, 2016. Because this was Richardson's final direct bank deposit, he did not receive compensation based on a pay period including December 26 through December 30, 2016. All told, in 2016, Core paid Richardson for 2008 regular hours and 72 holiday hours (9 days), or 2080 total hours. And Core paid him $100,964 in regular pay and $3,616 in holiday pay, or $104,580 in total. Consistent with these figures, Richardson's 2016 W-2 tax form showed that Richardson's gross pay from Core was $104,580.

¶ 17    Additionally, each of Richardson's paystubs reflected a withholding of 15 percent for his 401(k) account. As a result, from his first paystub until his paystub of June 10, 2016, $300 of his $2000 in gross pay was withheld for his 401(k). However, due to his hourly rate increase of $.50, beginning with his pay stub of June 17, 2016, $303 of his $2020 in gross pay was withheld for his 401(k). Concerning Richardson's back-end benefits in 2016, Core paid the benefits on his behalf at a rate of $29.22 per hour from January 2016 through May 2016 and at a rate of $30.83 per hour from June 2016 through December 2016. In order to pay these back-end benefits, Core would submit its employees hours and receive in return a contribution summary with the total amount of benefits owed to Local 597. Core would then pay the required amount collectively on behalf of all employees through one monthly bank transfer to Local 597. Bank records show that Core paid Local 597 monthly for the 2016 back-end benefits.

¶ 18    Based on Core's compensation directly to Richardson and to Local 597 on Richardson's behalf for the back-end benefits, Core and Lisa Sheehy believed that they had satisfied the

requirements of the Guaranteed Minimum 2016 Compensation. And so when Richardson and JR implicitly rejected their exercise of the option, Core and Lisa Sheehy believed that Richardson and JR were not abiding by the terms of the lease agreement. As a result, on January 17, 2017, Core sued JR seeking specific performance of the option to purchase and alleging breach of contract. In response, JR answered Core's complaint and denied that Core had fully met all conditions precedent under the lease agreement to entitle it to exercise the option to purchase. JR also filed its own breach of contract counterclaims against Core. Thereafter, Core answered JR's counterclaims, denied liability and filed affirmative defenses. Litigation between the parties continued.

¶ 19    In March 2017, while the litigation in this case was ongoing, the accounting firm Costin, Hammel & Leake completed an audit of Core in connection with it being a contractor of Local 597. The purpose of the audit was to evaluate the accuracy of Core's reporting of its employees' hours and its contributions to Local 597's benefit funds between October 2013 and August 31, 2016. As relevant to this case, the audit revealed that, in June 2016, Core withheld $1206 for Richardson's 401(k) account yet remitted only $1200 to Local 597 on his behalf, thus shortchanging him by $6. During a deposition, Rymek, Core's auditor, testified that she believed the error occurred when Richardson received his $.50 per hour raise in June 2016, and Core's remittance of money to his 401(k) account did not accurately reflect the raise. Accordingly, in April 2018, Maloney, Local 597's president and collection coordinator for the union's benefit funds, sent a letter to Core noting that the audit revealed a total shortage in 401(k) remittances of $90.51 for the audit period, $6 of which was attributable to Richardson. Maloney concluded the letter by requesting Core pay the shortage plus interest and liquidated damages. According to an

affidavit signed by Maloney, Core remitted the shortage in Richardson's 401(k) account in May 2018.

¶ 20    In that same audit, Rymek discovered that, in June 2015, Core underreported Richardson's hours when it reported that he worked 152 hours yet it should have reported that he worked 155 hours for benefits purposes. Although the actual audit noted this underreporting occurred in June 2015, during her deposition, Rymek believed it was actually June 2016 based on her review of the source documents. Rymek explained the underreporting had to do with Richardson's status at that time where, although he was not actually an "alumni," she believed he should have been classified as such because he was a salaried employee. An alumni was an individual who had previously worked in the field, but had since assumed a role that was not described in the area agreement. In order to be classified as an alumni, there had to be a signed agreement between various parties. There was no evidence that Richardson actually signed an alumni agreement, and indeed, Richardson himself acknowledged during a deposition that he had not signed an alumni agreement. Although the audit revealed that Core underreported Richardson's hours, the audit found as a whole that Core made a near $2300 net overpayment to Local 597's benefit funds during the audit period. As a result, in the April 2018 letter from Maloney, he noted that, based on the audit, Core overpaid Local 597 and requested Core deduct the amount of the overpayment from a subsequent payment.

¶ 21    In addition to the first audit, Rymek conducted a second audit of Core for the period between September 1, 2016, and June 2019. As relevant to this case, the audit revealed that, in September 2016, Core reported Richardson as having worked 200 hours when, in actuality, Core should have only reported 192 hours for benefit purposes. According to her deposition, Rymek attributed the error to Core paying Richardson eight hours of regular work time when those hours

should have been deemed holiday time. The error was a part of several misreporting of hours by Core, resulting in a net overpayment of $1,033.60 to Local 597's benefit funds during the audit period. However, the audit also revealed that Core improperly compensated a subcontractor by approximately $9200. As such, in a September 2019 letter from Maloney to Core, he acknowledged the overpayment to Local 597's benefit funds but, due to the subcontractor issue, requested Core pay additional amounts of money. According to the affidavit signed by Maloney, Local 597 updated its records to reflect the correct hours for Richardson in September 2019. Additionally, according to an affidavit of Thomas Kotel, the recording secretary of Local 597, as of July 2020, Core was a signatory contractor in good standing with the union, meaning Core had paid the obligatory amounts to Local 597's benefit funds.

¶ 22     During the course of litigation between the parties, JR attempted to evict Core by filing a complaint in the municipal division of the circuit court seeking possession of the property. In JR's eviction lawsuit, it alleged that Core violated the lease by refusing access to address a purported building code violation. However, upon Core's motion, the trial judge in the municipal division dismissed JR's complaint and gave Core leave to move for fees and costs under the lease's prevailing-party provision. Core filed a fee petition, and the trial judge in the municipal division awarded Core's fees. Thereafter, JR unsuccessfully appealed the fee award. See *JR Industries, LLC v. Core Mechanical, Inc.*, 2019 IL App (1st) 182026-U.

¶ 23     Ultimately, in November 2020, in the instant case in the circuit court, Core joined by Lisa Sheehy as a plaintiff filed their fifth amended complaint against JR and Richardson, the latter of whom was now involved in the litigation as a defendant. Richardson also filed a third-party complaint against Jerry Sheehy and Brian Sheehy. Multiple counterclaims and crossclaims were filed between the various parties. Despite Core and Lisa Sheehy's fifth amended complaint

containing seven counts, only Counts I and II (claims for specific performance and breach of contract, respectively) are relevant to this appeal.

¶ 24    In their fifth amended complaint, Core and Lisa Sheehy asserted that Core had satisfied all conditions precedent to exercise its option to purchase, including paying Richardson the " 'Guaranteed Minimum 2016 Compensation.' " Further, Core and Lisa Sheehy claimed that, around January 3, 2017, they notified JR in writing that they were exercising their option to purchase the property. Core and Lisa Sheehy stated that Core had "access to sufficient funding by securing bank financing there for" and was "ready, willing and able to perform all terms of the Lease Agreement and the Option to Purchase included therein, applicable to Core, requisite to demand and receive a good and sufficient deed to the real property as promised by JR." Core and Lisa Sheehy alleged that, despite all conditions precedent being satisfied, JR rejected Core's exercise of the option and refused to convey the property. Instead, Core and Lisa Sheehy claimed that JR imposed extraneous conditions that the parties' agreements did not contemplate. As a result, in Count I, Core sought an order forcing JR to specifically perform the lease agreement and deliver title of the property to Core. In Count II, Core raised a claim of breach of contract for JR and Richardson's failure to perform their obligations under the lease agreement.

¶ 25    In JR and Richardson's answer, they denied that Core had fully met all conditions precedent under the lease agreement to exercise the option to purchase the property, specifically noting Core's failure to fulfill its obligation to pay Richardson the Guaranteed Minimum 2016 Compensation. As such, Richardson and JR denied that they had breached their lease agreement with Core and denied that Core was entitled to specific performance.

¶ 26    In February 2021, Core and Lisa Sheehy, as well as JR filed cross-motions for summary judgment on Counts I and II of Core and Lisa Sheehy's fifth amended complaint. Because of our

ultimate disposition in this case, we need not focus on JR's motion for summary judgment and instead, we can focus solely on Core and Lisa Sheehy's motion. Therein, Core and Lisa Sheehy contended that the undisputed material facts showed that they fully satisfied, and at the very least substantially performed, the conditions precedent to exercising the option to purchase, in particular paying Richardson the Guaranteed Minimum 2016 Compensation. As such, Core and Lisa Sheehy argued that they were entitled to specific performance of the option to purchase, or alternatively, entitled to judgment on the breach of contract claim.

¶ 27    In response, JR referenced many arguments made in its own motion for summary judgment and rejected the assertion that Core had fully satisfied the Guaranteed Minimum 2016 Compensation. JR asserted that this provision required Richardson to be on Core's payroll for 2080 hours during the 2016 calendar year. In other words, JR posited that the hours had to be incurred between January 1, 2016—his employment agreement's start date—and December 31, 2016—his end date. And to this end, JR highlighted that Richardson's first paystub of 2016, which was dated January 8, 2016, was for a pay period beginning December 28, 2015, and ending January 3, 2016, thus allegedly covering 32 hours in 2015. Additionally, JR noted that Richardson's last paystub was dated December 30, 2016, which was for a pay period beginning December 19 and ending December 25, 2016. Thus, according to JR, Core improperly failed to pay Richardson for the last work week of 2016, *i.e.*, December 26 through December 30.

¶ 28    Moreover, JR asserted that Core failed to properly compensate Local 597 on Richardson's behalf in multiple manners for the back-end benefits. First, JR noted that Core admitted to remitting too little to Richardson's 401(k) account than what he withheld, a failure that was not corrected until May 2018. Second, JR highlighted that Rymek's audit of Core revealed that, in June 2016, Core underreported Richardson's hours, meaning Core also undercompensated Local

597 on Richardson's behalf for back-end benefits. JR observed that this deficiency existed at the time of Rymek's audit in March 2017 and necessarily had to exist when Core attempted to exercise its option to purchase two months earlier. Third, JR observed that Richardson worked in the field on January 18, 2016, which was Martin Luther King Jr. Day, at the Park Hyatt Hotel in Chicago and February 15, 2016, which was Presidents' Day, at a project in Lake of the Hills, Illinois. JR supported both assertions with various forms of evidence, including Richardson's calendar. And further, evidence, including deposition testimony from Richardson, demonstrated that Core paid him in cash at a rate of $75 per hour for his work on these two days. JR pointed to Richardson's paystubs from the time periods in question and observed that they showed 16 total hours attributed to holiday time that should have been attributed to regular hours because he worked on those days. Because of this misattribution, JR argued that Core failed to compensate Local 597 on Richardson's behalf for back-end benefits for his work on those two days. Lastly, JR posited that, because Richardson was owed hourly compensation for the final days of December 2016, he was similarly owed corresponding back-end benefits for those hours. Because of the alleged deficiencies in Core paying Richardson's Guaranteed Minimum 2016 Compensation, JR contended that Core and Lisa Sheehy's motion for summary judgment had to be denied.

¶ 29    After Core and Lisa Sheehy filed their reply in support of their motion for summary judgment, the circuit court held an oral argument on the parties' motions. In October 2021, the court provided an oral ruling on the motions and observed that, of the conditions precedent to Core exercising the option to purchase, only the payment of the Guaranteed Minimum 2016 Compensation was at issue. First, the court found that the parties' agreements only required Richardson to be paid a salary equal to $50 an hour for 40 hours a week for 52 weeks, or $104,000. The court observed that Richardson was actually paid $104,580 for 2016, and therefore, Core met

its salary obligation to Richardson. Next, the court highlighted the various deficiencies JR alleged in Core's contributions to Local 597 for Richardson's back-end benefits, but rejected all of them and found that Core had sufficiently contributed to Local 597's benefit funds on Richardson's behalf. In turn, the court concluded that Core was entitled to exercise the option to purchase the property and specific performance was warranted. Consequently, in a written order, the court granted Core and Lisa Sheehy's motion for summary judgment for the reasons stated on the record, and denied JR's motion.[1] The court further ordered JR to convey title to the property to Core on a date to be determined during a subsequent status hearing.

¶ 30    The following week, JR and Richardson filed a motion, *inter alia*, for a finding of immediate appealability pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). In December 2021, the court entered an order setting the terms of the purchase and sale of the property and found that, pursuant to Rule 304(a), there was no just reason to delay either the enforcement or appeal of the order setting the terms of the purchase and sale of the property or its summary judgment order. Thereafter, JR and Richardson filed their notice of appeal.

¶ 31                                    II. ANALYSIS

¶ 32    JR and Richardson contend that the circuit court erred in granting Core and Lisa Sheehy's motion for summary judgment where Core failed to satisfy the Guaranteed Minimum 2016 Compensation provision of the parties' various agreements.

¶ 33    In the instant case, the parties filed cross-motions for summary judgment on Counts I and II of Lisa Sheehy and Core's fifth amended complaint. By filing cross-motions for summary judgment, the parties agree that there is only a question of law involved and invite the court to

---

[1] By the date of the circuit court's ruling, Core and Lisa Sheehy had filed their sixth amended complaint.

resolve the litigation based solely upon the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. While the parties' filings of cross-motions for summary judgment may indicate their agreement that there is only a question of law involved, "the mere filing of cross-motions for summary judgment does not establish that there is no issue of material fact, nor does it obligate a court to render summary judgment." *Id.* A disposition of litigation on a motion for "[s]ummary judgment is a drastic measure," and such a motion "should only be granted if the movant's right to judgment is clear and free from doubt." *Seymour v. Collins*, 2015 IL 118432, ¶ 42. The circuit court should only grant summary judgment where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, demonstrate that there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. *Pielet*, 2012 IL 112064, ¶ 29. A genuine issue of material fact exists where the material facts are disputed or reasonable people could draw different inferences from the undisputed facts. *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. We review the circuit court's ruling on cross-motions for summary judgment *de novo*. *Pielet*, 2012 IL 112064, ¶ 30.

¶ 34     Additionally, the interpretation and construction of a lease agreement, as a contract, is a question of law, which we also review *de novo*. *In re Marriage of Dynako*, 2021 IL 126835, ¶ 15; *Midland Management Co. v. Helgason*, 158 Ill. 2d 98, 103 (1994). Because the interpretation of a contract is a question of law, such an issue may be resolved through summary judgment. *Wolff v. Bethany North Suburban Group*, 2021 IL App (1st) 191858, ¶ 36. The primary objective when construing a contract is to give effect to the parties' intent as expressed through the language of the contract. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232-33 (2007). The plain and ordinary language of the agreement is the best indicator of that intent. *Id.* at 233. Because a contract's language is context dependent, a court does not look at individual provisions in isolation, but rather looks at

the agreement as a whole. *Id.* Where the language of a contract is susceptible to more than one meaning, that language is ambiguous. *Id.* In such situations, the court may consider extrinsic evidence in order to determine the parties' intent. *Id.*

¶ 35    In this case, we are tasked with construing a lease agreement's option to purchase. An option to purchase in the real estate context is an agreement whereby the owner of a property agrees that another person shall have the right to purchase the property in the future. *Bruss v. Klein*, 210 Ill. App. 3d 72, 79 (1991) (citing *Morris v. Goldthorp*, 390 Ill. 185, 191 (1945)). But to do so, the option must be exercised in accordance with its terms (*id.*), and "[t]he lessee must exercise the option in strict conformity with all conditions prescribed and not waived by the lessor." *Wolfram Partnership, Ltd. v. LaSalle National Bank*, 328 Ill. App. 3d 207, 217 (2001); see also *Morris*, 390 Ill. at 195 ("It is elementary that where one party gives an option to another, the acceptance, to be valid so as to conclude an agreement or contract between the parties, must, in every respect, meet and correspond with the offer, neither falling short of, nor going beyond, the terms proposed but exactly meeting them at all points and closing with them just as they stand.").

¶ 36    We now turn to the option to purchase contained in the lease agreement between Core and JR, which provided that:

> "[Core], or its designee, shall have the right, at its sole discretion, to purchase the
> Premises from [JR] after twelve (12) months from the date hereof and upon the full
> satisfaction of the Note and the Guaranteed Minimum 2016 Compensation, unless
> agreed upon sooner, in writing, by [JR]. The purchase price of the Premises shall
> be the then-current outstanding mortgage balance with Chase Bank."

It is undisputed based on the language of the option to purchase that, in order for Core to exercise the option, it had to: (1) wait until January 1, 2017, to exercise the option; (2) fully satisfy the

promissory note; and (3) pay Richardson the "Guaranteed Minimum 2016 Compensation." JR and Richardson do not dispute that the first and second conditions precedent have been met. In turn, this case focuses on whether the third condition precedent—paying Richardson the "Guaranteed Minimum 2016 Compensation"—has been satisfied.

¶ 37    The binding letter of intent initially defined the term "Guaranteed Minimum 2016 Compensation." Therein, the letter of intent stated that Lisa Sheehy and Richardson agreed he would:

> "remain on the payroll as an employee of Core, subject to an agreement ("Employment Agreement"), through December 31, 2018. The Employment Agreement shall define the terms of employment and shall guarantee [he] be paid at a rate of $50 per hour for 2080 hours annually and shall include paying all Union 597 'back-end' benefits through the end of 2016."

In turn, Richardson's employment agreement provided that, from January 1, 2016, through December 31, 2016, Core would pay him "Fifty Dollars ($50.00) per hour, forty hours per week, payable each week." Additionally, the employment agreement required Core to pay "all Union 597 'back-end' benefits" on Richardson's behalf. As such, the Guaranteed Minimum 2016 Compensation contained two parts: the salary component and the benefits component.

¶ 38                                    A. Salary Component

¶ 39    First, we must determine if Core satisfied the salary component of the Guaranteed Minimum 2016 Compensation. As discussed, the binding letter of intent defined the term "Guaranteed Minimum 2016 Compensation," but noted that there would also be an employment agreement that would define the terms of Richardson's employment. A letter of intent may be enforceable as a binding contract. See *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill.

2d 281, 288, 303 (1990); *Magnus v. Lutheran General Health Care System*, 235 Ill. App. 3d 173, 181 (1992). The critical aspect in determining if a letter of intent is an enforceable, binding contract is the intent of the parties. *Quake*, 141 Ill. 2d at 288. In the instant case, the letter of intent was intended to be binding. First, the document was titled "Binding Letter of Intent." And second, in the first page of the letter of intent, it stated: "It is understood that this Binding Letter of Intent is intended to constitute a binding agreement by and between [Lisa Sheehy] and [Richardson]." As the letter of intent was an enforceable contract, and it referenced Richardson's employment agreement, both must be construed together. See *Wiczer v. Wojciak*, 2015 IL App (1st) 123753, ¶ 36 ("Contracts which specifically incorporate other documents by reference are to be construed as a whole with those other documents.").

¶ 40    Based on the language of the binding letter of intent, which guaranteed Richardson compensation of "$50 per hour for 2080 hours annually," it required him to be paid a minimum of $104,000. However, the parties conditioned this minimum salaried compensation on the terms of the employment agreement, which required Core to pay Richardson "Fifty Dollars ($50.00) per hour, forty hours per week, payable each week" from January 1, 2016, through December 31, 2016. Stated otherwise, the binding letter of intent provided the what—a minimum of $104,000 in compensation based on 2080 hours of "work"—and the employment agreement provided the how—compensation weekly based on a rate of $50 per hour and a 40-hour work week. Richardson's paystubs showed that, over the course of 2016, Core paid him for 2008 regular hours and 72 holiday hours, or 2080 total hours. Based on his initial hourly rate of $50 and his subsequent $.50 raise in June 2016, Core paid him $100,964 in regular pay and $3,616 in holiday pay, or $104,580 in total, which was corroborated by his 2016 W-2 tax form showing $104,580 in gross pay. Based on this compensation to Richardson, Core satisfied the salary component of the

Guaranteed Minimum 2016 Compensation, as Core compensated Richardson beyond the minimum, guaranteed salaried compensation.

¶ 41    Nevertheless, JR and Richardson posit that, while he received $104,580 from Core, his first paystub, which had a pay period from December 28, 2015, until January 3, 2016, and a pay date of January 8, 2016, compensated him for work in the last week of December 2015. Stated otherwise, they argue that any compensation for the last week of December 2015 did not constitute compensation for purposes of the Guaranteed Minimum 2016 Compensation, as Core had a preexisting obligation to make that payment to him. As highlighted by JR and Richardson, under the preexisting duty rule, "where a party does what it is already legally obligated to do, there is no consideration as there is no detriment." *White v. Village of Homewood*, 256 Ill. App. 3d 354, 357 (1993). And indeed, "[c]onsideration cannot flow from an act performed pursuant to a preexisting legal duty." *Id.*

¶ 42    But, as Core and Lisa Sheehy point out, the problem with this argument is that JR and Richardson never presented any evidence that he had an employment contract with Core in his individual capacity in 2015 or that he performed any compensable work during the final week of 2015. See *Neufairfield Homeowners Ass'n v. Wagner*, 2015 IL App (3d) 140775, ¶ 15 (a movant for summary judgment may support its case "by establishing that there is an absence of evidence to support the nonmovant's case"). JR and Richardson assert that they did provide such evidence, first highlighting alleged admissions made by Lisa Sheehy during testimony at a preliminary injunction hearing and at a deposition. According to JR and Richardson, Lisa Sheehy purportedly conceded that 32 hours Core paid Richardson in his first paystub was for work Richardson performed in 2015 and such compensation did not count toward the Guarantee Minimum 2016

Compensation. In neither highlighted testimony did Lisa Sheehy admit that Richardson's first paystub included compensation for hours worked prior to 2016.

¶ 43    During Lisa Sheehy's deposition, she was asked a hypothetical about if Richardson had worked on December 31, 2015, would those hours be "incorporated into this [employment] agreement?" Sheehy responded: "Not by what's written here." In response to a follow-up question about whether "those hours should not be credited towards Core's payment of 2,080 hours if they were worked in 2015," Lisa Sheehy asserted: "This clearly states January 1 to December 31, 2016." A week later, during her testimony at the preliminary injunction hearing, she was asked about her answer to that question from the deposition and agreed she gave that answer. She also was asked if Richardson had "worked on a day that occurred in 2015 for which payment was made to him by Core in 2016, [would that] satisfy" the salary component of the Guaranteed Minimum 2016 Compensation? Lisa Sheehy responded: "I don't know that it satisfies this term." She was later asked and answered the following:

"Q. So [the first] pay stub has four days of working within 2015, correct?

A. Correct.

Q. This was paid on January 8th, 2016, correct?

A. Correct.

Q. So, the hours that are identified on the days that were worked in 2015, but this check being paid in 2016, you believe that satisfies the terms [of the Guarantee Minimum 2016 Compensation]?

A. I believe that it does. I'm basing this on receiving 52 paychecks."

Many of the questions posed to Lisa Sheehy were hypotheticals based on the premise that Richardson had performed work that entitled him to compensation at the end of December 2015. But, as discussed, JR and Richardson never presented any evidence that he had an employment contract with Core in his individual capacity in 2015 or that he performed any compensable work during the final week of 2015, meaning Lisa Sheehy's answers to the hypothetical questions were based on a nonexistent premise. See *Groce v. South Chicago Community Hospital*, 282 Ill. App. 3d 1004, 1011 (1996) (finding a deponent's "answer to the hypothetical question posed during his deposition could only" support summary judgment "if the record before the trial court also contained competent, uncontradicted evidentiary material in support of each of the three factual components upon which the hypothetical question was based"). Moreover, the fact that JR and Richardson never presented any evidence that he had an employment contract with Core in his individual capacity in 2015 or that he performed any compensable work during the final week of 2015 also means that any claim by Richardson and JR that he performed compensable work at the end of 2015 is without evidentiary support. See *Neufairfield Homeowners*, 2015 IL App (3d) 140775, ¶ 15. As such, Lisa Sheehy's alleged admissions are inconsequential.

¶ 44    JR and Richardson further attempt to dissect the week of his first pay period of December 28, 2015, until January 3, 2016, to show that any hours in his first paystub had to have come from 2015. They observe that January 1, 2016, was a recognized union holiday, January 2, 2016, was a Saturday and January 3, 2016, was a Sunday, so Richardson could not have worked any regular hours those days because work on all three would have been compensable with overtime. JR and Richardson's argument is unconvincing. The simple fact is that Richardson never had to work for *any* of the hours that were reflected in his paystubs from 2016. The binding letter of intent and employment agreement guaranteed him at least $104,000 and determined that he would be paid

this amount by weekly direct bank deposits that apparently allowed Richardson to obtain union benefits, including health insurance and a 401(k), despite not working at all for that salary. Core paid Richardson $104,580, and it did so weekly based on a rate of $50 per hour and a 40-hour work week. And once Core did so Core fulfilled its obligations regardless of precise allocation of the hours.

¶ 45    JR and Richardson also point to the stock purchase agreement, which required that Lisa Sheehy, as Core's new owner, maintain full responsibility for all accounts payable, and other monetary obligations of Core. As JR and Richardson observe, "[a] mere sale or purchase of stock does not eliminate the corporation's debts and obligations because the legal entity remains the same." *Sinquefield v. Sears Roebuck & Co.*, 209 Ill. App. 3d 595, 597 (1991). However, absent any evidence Richardson had an employment contract with Core in his individual capacity in 2015 or that he performed any compensable work during the final week of 2015, there is no legally cognizable preexisting obligation to compensate Richardson in this manner. See *Neufairfield Homeowners*, 2015 IL App (3d) 140775, ¶ 15. As such, the fact that Richardson's first paystub encompassed a pay period beginning in late December 2015 does not mean that Core failed to compensate him appropriately pursuant to both the binding letter of intent and his employment agreement.

¶ 46    Next, JR and Richardson highlight his final paystub, which had a pay period from December 19, 2016, until December 25, 2016, and a pay date of December 30, 2016. According to JR and Richardson, Core failed to pay him any compensation for the final days of December 2016 (December 26 through December 30). Thus, according to JR and Richardson, Core failed to keep Richardson on the company's payroll through the end of December 2016, which his employment agreement allegedly required. Once Core met its minimum compensation obligation

to Richardson in late December 2016, he was not entitled to any salaried compensation for the final days of December 2016. But because Core's notice of termination of Richardson was deemed effective on December 31, 2016, despite the fact that Richardson was not entitled to any salaried compensation for the final days of December 2016, Richardson still would have been entitled to any work he *actually* performed through the end of December 2016 (at a rate of $75 per hour) plus his profit-split percentage for work he personally procured. So while he was not entitled to receive salaried compensation for the final week of December 2016, he still could have received other compensation and therefore, was still technically on the company's payroll through the end of December 2016.

¶ 47    Additionally, Richardson and JR highlight that the stock purchase agreement provided that Anna Richardson, Jesse's wife, would cease being an employee of Core and be removed from its payroll effective December 31, 2015. Yet, according to Richardson and JR, evidence in the record showed that Anna Richardson received her last paystub from Core on January 8, 2016, necessarily implying that Jesse Richardson, too, should have received his final paystub from Core in January 2017. In their opening brief, they cite solely to deposition testimony from Roti for support. But the portion of Roti's deposition cited by Richardson and JR does not corroborate their position that Anna Richardson received her last paystub from Core on January 8, 2016. In the portion of Roti's deposition cited by Richardson and JR, Roti was asked if it was his understanding that "Anna Richardson received an ADP payroll stub, a payment, in January of 2016 to compensate her for employment on December 31st of 2015?" Roti responded: "I don't recall." In another portion of Roti's deposition cited by Richardson and JR, Roti was asked if he "recall[ed] the testimony that Anna Richardson received a pay stub in the first week of January 2016," presumably referencing the question above. In response, Roti replied: "I don't recall that she did that. Did you ask me that,

or did we look at that? I wasn't involved with the payroll records then *** . And I don't know." When asked a follow-up on the same topic, Roti stated that he was "not familiar with the hours that Anna Richardson worked." In Richardson and JR's reply brief, they cite to additional deposition testimony, from Richardson himself, where he asserted that his wife, Anna, received a paycheck from Core in January 2016. Accepting Richardson's assertion as true, as there is no contradictory evidence in the record (see *Cnota v. Palatine Area Football Ass'n*, 227 Ill. App. 3d 640, 652 (1992)), it does not follow that Jesse Richardson should also have been given a paystub in January 2017 given the unique nature of his employment arrangement with Core.

¶ 48    Finally, we note that Core and Lisa Sheehy's claim that it sufficiently compensated Richardson for the salary component of the Guaranteed Minimum 2016 Compensation was buttressed by the silence of Thompson, Richardson's attorney, in his January 4, 2017, e-mail to Roti. In the days leading up to January 4, 2017, Roti and Thompson were having discussions about Core exercising the option to purchase. On January 3, 2017, Roti e-mailed Thompson and stated that he attached copies of Richardson's paystubs through December 30, 2016, and evidence of electronic payments for Richardson's back-end benefits from Core to Local 597, which "confirm[ed] the last payments of the Guaranteed Minimum 2016 Compensation." Additionally, Roti provided calculations showing that Core paid Richardson for 52 weeks and 40 hours per week, or 2080 hours total, and paid Richardson $104,580 for 2016. Roti asked when he could expect a payoff letter from Chase Bank so he could forward the letter to the bank Core was using to finance the purchase of the property. The next day, Thompson responded to Roti and provided the amount of the outstanding mortgage on the property and a list of perceived issues preventing Core's proper exercise of the option to purchase. Notably, none of the issues raised by Richardson involved the salary component of the Guaranteed Minimum 2016 Compensation. "The rule is well recognized

that admissions may be implied by silence when the circumstances are such as not only afford an opportunity to act or speak, but also properly and naturally call for action or reply by persons similarly situated." *Dill v. Widman*, 413 Ill. 448, 454 (1952).

¶ 49 To the extent that there was any ambiguity in the construction of the Guaranteed Minimum 2016 Compensation provisions, "[t]he intended meaning of ambiguous contract language may be derived from the circumstances surrounding the formation of a contract or from the conduct of the parties subsequent to its formation." *Szafranski v. Dunston*, 2015 IL App (1st) 122975-B, ¶ 102. And the subsequent acts of Richardson, through his attorney, show that they did not believe Core had failed to compensate him properly under the salary component of the Guaranteed Minimum 2016 Compensation in early January 2017. See *Segal v. Department of Insurance*, 404 Ill. App. 3d 998, 1002 (2010) (observing that "knowledge of an attorney is knowledge of, or imputed to the client").

¶ 50 It is true that, in a December 8, 2016, e-mail from Thompson to Carbonara, Lisa Sheehy's attorney, he noted that Richardson's paystub from December 4, 2016, "disclosed that he ha[d] only been paid for 1888 hours," and "[t]he 190 or so missing hours *** [would] need to be accounted for at closing." Given that Core would only compensate Richardson for 120 more hours in 2016, this e-mail possibly showed that Thompson believed Richardson was owed for more hours than what Core ended up paying him. But, in a deposition of Thompson, when asked whether he would have raised an issue about the salary component of the Guaranteed Minimum 2016 Compensation in his January 4, 2017, e-mail response to Roti had he believed Core fell short of its obligation, Thompson acknowledged that he did not "recall [his] exact thinking when [he] wrote this e-mail," as it had been close to four years since he did. Yet he then asserted: "Presumably, I would have said you owe cash money to Jesse for the pay in addition to the back-end if I thought the 2,080

hours had not been satisfied. That was a—yeah, that would seem like a fair inference to draw from my e-mail, I guess."

¶ 51 Attempting to downplay Thompson's response to Roti, JR and Richardson claim that Thompson's failure to raise the issue is meaningless because Thompson sent the e-mail two days before Richardson expected to receive his final direct bank deposit, which would have been on January 6, 2017, and covered a pay period from December 26, 2016, to January 1, 2017. According to JR and Richardson, Thompson did not include the issue because the deficiency ceased to exist at that time. Yet, in Roti's email, he very clearly stated that Core had made: "the *last* payments of the Guaranteed Minimum 2016 Compensation." (Emphasis added.) Regardless, Thompson's silence in the January 4, 2017, is not determinative of whether Core satisfied the salary component of the Guaranteed Minimum 2016 Compensation, but merely corroboration for the other evidence that Core satisfied its obligation. Consequently, there is no genuine issue of material fact that Core sufficiently compensated Richardson for the salary component of the Guaranteed Minimum 2016 Compensation.

¶ 52                                    B. Benefits Component

¶ 53 We next must determine if Core satisfied the benefits component of the Guaranteed Minimum 2016 Compensation. Like with the salary component, there were two critical documents: the binding letter of intent and Richardson's employment agreement. The letter of intent stated that Richardson's employment agreement "shall include paying all Union 597 'back-end' benefits through the end of 2016." See *Wiczer*, 2015 IL App (1st) 123753, ¶ 36 ("Contracts which specifically incorporate other documents by reference are to be construed as a whole with those other documents."). In turn, Richardson's employment agreement mandated that Core "pay all Union 597 'back-end' benefits on behalf of [Richardson]."

¶ 54    In asserting that Core failed to sufficiently satisfy the benefits component of the Guaranteed Minimum 2016 Compensation, JR and Richardson raise various arguments. First, JR and Richardson posit that, although Core withheld $1206 for Richardson's 401(k) account in June 2016, it remitted only $1200 to Local 597, thus shortchanging him by $6. Implicit in JR and Richardson's argument is that Richardson's 401(k) remittance is a "back-end benefit." To that end, although Core and Lisa Sheehy concede that Core made the $6 error, they contend that Core's error had nothing to do with its obligation to pay back-end benefits to Local 597 on behalf of Richardson.

¶ 55    Neither the binding letter of intent nor Richardson's employment agreement defined the term "back-end benefits." Generally, in such situations, we give that term its plain and ordinary meaning by looking at a dictionary. *West Bend Mutual Insurance Co. v. Krishna Schaumburg Tan, Inc.*, 2021 IL 125978, ¶ 38. In the instant case, "back-end benefits" is a colloquial term used by Local 597 contractors and members. Because using a dictionary to define the term "back-end benefits" would be fruitless and the term's meaning is unclear from the context of the agreements, we may use extrinsic evidence to resolve the ambiguity. *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007). Generally, "[w]here extrinsic evidence is introduced to aid in the interpretation of uncertain or ambiguous contract language, the question of the meaning of the language generally is left to the jury." *Wald v. Chicago Shippers Ass'n*, 175 Ill. App. 3d 607, 619 (1988). However, if "after taking into account the extrinsic evidence, the court determines that a reasonable person could reach only one conclusion, then the issue should be decided by the trial court." *Id.* In the instant case, we have such a situation given the deposition testimony and documentary exhibits attached to Core and Lisa Sheehy's motion for summary judgment.

¶ 56    According to various testimony and documentary evidence, including contribution summaries of Local 597's benefit funds and wage letters between the Mechanical Contractors Association and Local 597, the back-end benefits were comprised of six funds—(1) a welfare fund, *i.e.*, health insurance; (2) a retirement fund; (3) a defined contribution fund; (4) a labor-management cooperation committee fund; (5) a training fund; and (6) an education fund—that Core would pay to Local 597 on behalf of its union employees. Using this evidence, Core and Lisa Sheehy posit that the 401(k) remittance is not a back-end benefit. JR and Richardson not only disagree with this proposition, but claim that Core and Lisa Sheehy improperly raised this argument for the first time on appeal. See *Wells Fargo Bank, N.A. v. Maka*, 2017 IL App (1st) 153010, ¶ 24 (noting that, generally, it is improper to raise an argument for the first time on appeal). However, an appellee may raise arguments for the time on appeal in support of the judgment of the circuit court. See *Hynes v. Snyder*, 355 Ill. App. 3d 394, 398 (2005) (citing *People v. Pinkonsly*, 207 Ill. 2d 555, 562-63 (2003)). Moreover, we may affirm the lower court's grant of summary judgment on any basis supported by the record. See *Trigsted v. Chicago Transit Authority*, 2013 IL App (1st) 122468, ¶ 50. Thus, we may address Core and Lisa Sheehy's argument that Richardson's 401(k) remittance is not a back-end benefit.

¶ 57    In support of JR and Richardson's argument that the 401(k) remittance is a back-end benefit, they claim that "Core's witnesses testified that they understood that the [Local] 597 auditor's report was the decision-maker for 'back-end benefits' as that phrase is used in the parties' contracts." In other words, because Rymek audited Core's compliance with Local 597's benefit funds and 401(k) remittances, the 401(k) remittances were back-end benefits. However, despite claiming multiple Core witnesses believed this, JR and Richardson only cite to one witness's testimony, that of Jerry Sheehy, Lisa's husband and an employee of Core, during the preliminary

injection hearing. In that hearing, Jerry Sheehy merely was asked whether he was "aware of whether or not [Local] 597 ever audited Core's compliance with their—with the contract with them?" And in response, Jerry Sheehy stated that Local 597 did audit Core's compliance. Such testimony does not provide any evidence that the 401(k) remittances are considered back-end benefits like the various funds above. As such, to the extent JR and Richardson attempt to posit that the issue over the 401(k) remittances is a genuine issue of material fact that should have prevented the circuit court from granting Core and Lisa Sheehy's motion for summary judgment, their argument fails because they have not produced any competent evidence which would allow us to find the existence of a genuine issue of material fact. See *Pekin Insurance Co. v. Adams*, 343 Ill. App. 3d 272, 275 (2003) (stating that "genuine" for purposes of having a genuine issue of material fact "means there is evidence to support the position of the nonmoving party"). Furthermore, the binding letter of intent and Richardson's employment agreement both contemplated that Core would pay Local 597 the back-end benefits on Richardson's behalf. Clearly, the six funds discussed above involved specific rates that Core would pay per hour to Local 597 on Richardson's behalf. Meanwhile, the mechanism for Richardson's 401(k) account was different, as Core would merely remit to Local 597 money already withheld by Richardson. In other words, for purposes of Richardson's 401(k), Core was not paying Local 597 anything, rather it was just transferring Richardson's own pre-tax money. Consequently, Core's $6 remittance error does not implicate the back-end benefits component of the Guaranteed Minimum 2016 Compensation.

¶ 58    Next, JR and Richardson posit that Core failed to pay the back-end benefits on his behalf based on his work in the field on Martin Luther King Jr. Day (January 18, 2016) and Presidents' Day (February 15, 2016). In discussing this argument, we must consider the context to Richardson

working on these holidays. Between the binding letter of intent and Richardson's employment agreement, there was a clear distinction in hourly compensation for Richardson. One manner of compensation required him to actually work in the field, in which case Core paid him $75 per hour, and the other manner of compensation required no such actual work, in which case, Core paid him $50 per hour to be paid based on 2080 annual hours in 2016. Further, there was a difference in how Core paid Richardson. For his $50 per hour compensation, Core paid him via direct bank deposit. For his $75 per hour compensation, Core paid him with cash. And therein lies the problem with JR and Richardson's argument. According to deposition testimony from Jerry Sheehy and Roti, if Core paid a union member in cash for work, Core could not report those hours to Local 597 for back-end benefits purposes. Nothing in the record contradicts Jerry Sheehy or Roti's testimony. "Generally, an averment made in an affidavit or deposition in support of a motion for summary judgment that is not controverted by a counteraffidavit or counterdeposition will be taken as true." *In re Estate of Allen*, 365 Ill. App. 3d 378, 387 (2006); see also *Cnota*, 227 Ill. App. 3d at 652 ("When a deposition is used in support of a motion or response to a motion for summary judgment and is not contradicted by a counter-affidavit or deposition, the sworn testimony in the deposition must be accepted as true for purposes of the motion."). Absent any contradictory evidence, Jerry Sheehy and Roti's assertions must be accepted as true. Although Richardson and JR argue in conclusory fashion that Core was required to pay the back-end benefits on his behalf based on his work in the field on Martin Luther King Jr. Day and Presidents' Day, their own contradictory conclusions do not preclude entry of summary judgment on this issue. See *Cincinnati Insurance Co. v. Argubright*, 151 Ill. App. 3d 324, 329 (1986) (finding mere conclusions of fact unsupported by evidence could not create a triable issue of fact to preclude summary judgment). Therefore, Jerry Sheehy and Roti's testimony demonstrate that Richardson was not owed back-

end benefits for the hours he actually worked on Martin Luther King Jr. Day and Presidents' Day because Core compensated him with cash payments for that work.

¶ 59    We note that, in briefing below, JR and Richardson raised additional arguments regarding Core not properly paying Local 597 back-end benefits on his behalf. For instance, they argued that Core failed to properly pay Richardson's back-end benefits based on the audit revealing that Core underreported Richardson's hours in June 2016. JR and Richardson also argued that, because he was allegedly owed hourly compensation for the final days of December 2016, he was similarly owed corresponding back-end benefits for those hours. Indeed, when granting summary judgment in favor of Core and Lisa Sheehy, the circuit court rejected both of these arguments by JR and Richardson. In their opening brief's argument section, Richardson and JR did not raise any of these contentions. Although in their statement of facts, they did seemingly raise claims about Core not properly paying these back-end benefits, it is well-established that arguments cannot be included in a statement of facts. See Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020) (asserting that a statement of facts must be "stated accurately and fairly without argument or comment"). As such, we will disregard any arguments in JR and Richardson's statement of facts. See *John Crane Inc. v. Admiral Insurance Co.*, 391 Ill. App. 3d 693, 698 (2009) (observing that, based on Rule 341(h)(6), it would disregard "any inappropriate or unsupported statements" in the statement of facts).

¶ 60    JR and Richardson did, however, raise these arguments in their reply brief, which were in response to Core and Lisa Sheehy mentioning them in their appellees' brief to defend the circuit court's judgment. But in order for appellants' arguments to be properly before the appellate court, they must have been raised in the opening brief. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief."). Consequently, we will not address JR and Richardson's arguments about either Core failing to properly pay Richardson's

back-end benefits in June 2016 or the final days of December 2016. See *CF SBC Pledgor 1 2012-1 Trust v. Clark/School, LLC*, 2016 IL App (4th) 150568, ¶ 30 (declining to address an appellant's argument that was not raised in its opening brief even though the appellant later raised it in the reply brief). Consequently, there is no genuine issue of material fact that Core sufficiently compensated Richardson for the benefits component of the Guaranteed Minimum 2016 Compensation.

¶ 61    Because we have found that there is no genuine issue of material fact that Core sufficiently compensated Richardson for the salary and benefits component of the Guaranteed Minimum 2016 Compensation, we turn to Core and Lisa Sheehy's requested relief of specific performance. "A contract arising out of an option for the purchase of real estate is specifically enforceable in equity." *Bonde v. Weber*, 6 Ill. 2d 365, 380 (1955). In order to be entitled to specific performance, the plaintiff must prove: "(1) the existence of a valid, binding, and enforceable contract; (2) compliance by the plaintiff with the terms of the contract, or proof that the plaintiff is ready, willing, and able to perform the contract; and (3) the failure or refusal of the defendant to perform his part of the contract." *Hoxha v. LaSalle National Bank*, 365 Ill. App. 3d 80, 85 (2006). First, there is no dispute among the parties that there was a valid, binding and enforceable lease agreement. Second, as we have discussed above, there is no genuine issue of material fact that Core sufficiently compensated Richardson for purposes of the Guaranteed Minimum 2016 Compensation. Coupled with Core's compliance with the other conditions precedent of the option to purchase, Core has sufficiently proven that it complied with the terms of the option to purchase. And third, when Richardson and JR did not believe the conditions precedent were satisfied and implicitly rejected Lisa Sheehy and Core's exercise of the option, JR failed and refused to perform

their part of the agreement. As such, Core has proven all of the elements necessary to be entitled to specific performance.

¶ 62 Generally, the plaintiff is not entitled to specific performance as of right. *Daniels v. Anderson*, 162 Ill. 2d 47, 56 (1994). Rather, "the remedy rests in the sound discretion of the trial court, based on all of the facts and circumstances in evidence." *Id.* Although JR and Richardson do not raise an argument over the court's exercise of discretion, it is clear that the court properly utilized its discretion when awarding Core specific performance as its remedy for JR's failure to comply with the option to purchase. See *Hagen v. Anderson,* 317 Ill. 173, 177 (1925) ("Contracts to devise or convey real estate are enforced by specific performance on the ground that the law cannot do perfect justice."). Thus, in the instant case, the circuit court properly exercised its discretion when awarding specific performance to Core and mandating that JR convey the property. Consequently, the circuit court properly entered summary judgment in favor Core and Lisa Sheehy.

¶ 63                                  III. CONCLUSION

¶ 64 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 65 Affirmed.